## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RHP MASTER FUND, LTD.,                        :
                                              :
        **Plaintiff,**                              :
                                              :
        v.                                       :
                                              :    **CIVIL ACTION NO. 08-CV-4281**
CELL THERAPEUTICS, INC.,                      :
JOHN H. BAUER, JAMES A. BIANCO,               :
LOUIS A. BIANCO, VARTAN GREGORIAN,            :
RICHARD L. LOVE, MARY O'NEIL                  :
MUNDINGER, PHILLIP M. NUDELMAN,               :
JACK W. SINGER, and FREDERICK W.              :
TELLING,                                      :
                                              :
        **Defendants.**                            :

## AMENDED COMPLAINT

Plaintiff RHP Master Fund, Ltd. ("RHP"), for its Amended Complaint against

Cell Therapeutics, Inc. (the "Company" or "CTI"), and certain members of CTI's executive

management and Board of Directors (the "Board") (collectively, the "Individual Defendants"),

alleges as follows:

### THE PARTIES

1.    Plaintiff RHP is a limited company organized under the laws of the

Cayman Islands (a territory of the United Kingdom), with its registered address at P.O. Box 1234

Queensgate House, South Church Street, Grand Cayman KY1-1108, Cayman Islands, B.W.I.,

and with its principal place of business in the Cayman Islands.

2.    Defendant CTI is a Washington corporation with its principal place of

business at 501 Elliott Avenue West, Suite 400, Seattle, Washington 98119.

3.      Defendant James A. Bianco is, and at all relevant times was, a director, principal founder, President and Chief Executive Officer ("CEO") of CTI, and is a citizen of the State of Washington, residing at 10453 Maplewood Place SW, Seattle, Washington 98146-1076.

4.      Defendant Louis A. Bianco is, and at all relevant times was, a member of CTI's executive management and its Executive Vice President of Finance and Administration, and is a citizen of the State of Washington, residing at 9443 45th Avenue SW, Seattle, Washington 98146-2636.

5.      Defendant Jack W. Singer is, and at all relevant times was, a director, founder, Executive Vice President, and Chief Medical Officer of CTI, and is a citizen of the State of Washington, residing at 3515 E. Spring Street, Seattle, Washington 98122-5268.

6.      Defendants James A. Bianco, Louis A. Bianco, and Jack W. Singer are hereinafter collectively referred to as the "Officer Defendants" unless referenced specifically by name, as Individual Defendants, or in the case of James A. Bianco and Jack W. Singer, as members of the Board.

7.      Defendant John H. Bauer is, and at all relevant times was, a director of CTI, and is a citizen of the State of Washington, residing at 718 E. Aloha Street Apartment 10, Seattle, Washington 98102-4504.

8.      Defendant Vartan Gregorian is, and at all relevant times was, a director of CTI, and is a citizen of the State of New York, residing at 340 W 57th Street Apartment 18C, New York, New York  10019-3757.

9.      Defendant Richard L. Love is, and at all relevant times was, a director of CTI, and is a citizen of the State of Texas, residing at 116 Boot Hill 4762 Horseshoe Bay, Texas 78657-5732.

10.    Defendant Mary O'Neil Mundinger is, and at all relevant times was, a director of CTI, and is a citizen of the State of New York, residing at 200 Stuyvesant Avenue, Rye, New York 10580.

11.    Defendant Phillip M. Nudelman is, and at all relevant times was, a director of CTI, and is a citizen of the State of Washington, residing at 2355 Hidden Beach Drive, Greenbank, Washington 98253.

12.    Defendant Frederick W. Telling is, and at all relevant times was, a director of CTI, and is a citizen of the State of New Jersey, residing at 22 Briarwood Court, Woodcliff Lake, New Jersey 07677.

13.    Defendants John H. Bauer, Vartan Gregorian, Richard L. Love, Mary O'Neill Mundinger, Phillip M. Nudelman, and Frederick W. Telling are hereinafter collectively referred to as the "Non-Management Director Defendants" unless referenced specifically by name, as Individual Defendants, or as members of the Board.

## SUBJECT MATTER JURISDICTION AND VENUE

14.    The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(2). Section 1332(a)(2) provides that district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

15.    Complete diversity exists in this action because CTI and the Individual Defendants are all citizens of New Jersey, New York, Texas, or Washington, and RHP is not a citizen of any of these States. RHP is a subject of the United Kingdom because it is organized under the laws of the Cayman Islands, which is a foreign territory of the United Kingdom.

16.     Venue is proper under 28 U.S.C. § 1391 because the relevant agreement between the parties confers exclusive jurisdiction to the state and federal courts sitting in the City of New York.

## FACTUAL BACKGROUND

### CTI's February 8, 2007 Issuance of Preferred Stock

17.     On February 8, 2007, CTI entered into a Securities Purchase Agreement (the "Purchase Agreement") under which purchasers (the "Purchasers") bought shares of CTI convertible preferred stock.  (A true and correct copy of the Purchase Agreement is attached as Exhibit A.)  As part of this transaction, CTI issued 17,645 shares of Series A 3% Convertible Preferred Stock ("Series A Preferred Stock").

18.     The Purchase Agreement required Board approval because of the magnitude of the transaction and because it involved the issuance of securities of the Company.

19.     James Bianco signed the Purchase Agreement on behalf of CTI.

20.     RHP was one of the Purchasers, and holds 250 shares of Series A Preferred Stock.

21.     In connection with the February 8, 2007 transaction, CTI filed, among other documents, an Articles of Amendment to Amended and Restated Articles of Cell Therapeutics, Inc., Designation of Preferences, Rights, and Limitations of Series A 3% Convertible Preferred Stock (the "Series A Designation").  (A true and correct copy of the Series A Designation is attached as Exhibit B.)  The Series A Designation contained the "Terms of Preferred Stock" for the Series A Preferred Stock.

22.     The Series A Designation required Board approval because it is part of CTI's Articles of Incorporation.

4

23.     James Bianco signed the Series A Designation on behalf of CTI.

24.     Section 6(a) of the Series A Designation provides that the Series A
Preferred Stock shall be convertible to CTI Common Stock at the option of the holder thereof.
Section 6(b) provides that the Conversion Price "shall equal $1.6725."

### CTI's Violating Transaction

25.     On March 5, 2008, CTI filed a Form 8-K announcing, that on March 3,
2008, it had made a $16.2 million cash payment to certain of its preferred shareholders, including
to some of its Series A Preferred Stockholders (the "cash consideration").  The Form 8-K, signed
by Louis Bianco, announced:

> [C]ertain existing holders of the Company's Series A 3%
> Convertible Preferred Stock, Series B 3% Convertible Preferred
> Stock, Series C 3% Convertible Preferred Stock and Series D 7%
> Convertible Preferred Stock (the "Preferred Stock") converted
> their shares of Preferred Stock into common stock in accordance
> with the respective provisions of the Company's Amended and
> Restated Articles of Incorporation, induced by an aggregate cash
> payment of approximately $16.2 million. After satisfaction of the
> closing conditions and completion of the transaction,
> approximately $13.1 million of stated value of the Preferred Stock
> will remain outstanding.

(A true and correct copy of the Form 8-K dated March 5, 2008, without exhibits, is attached as
Exhibit C.)

26.     The cash consideration transaction required Board approval because of the
magnitude of the transaction and because part of the transaction involved the issuance of
securities of the Company.

27.     As further evidence that the Board approved the cash consideration
transaction, the relevant agreements, including the March 3, 2008 Securities Purchase Agreement
attached to the Form 8-K, represented and warranted that "the transactions contemplated hereby
and thereby have been duly authorized by all necessary action on the part of the Company and no

further action is required by the Company, its board of directors or its stockholders in connection therewith…." *See* the March 3, 2008 Securities Purchase Agreement § 3.1(c), entitled "Authorization; Enforcement."

28.     Although RHP is a holder of Series A Preferred Stock, RHP was not offered the cash consideration that was offered to other holders of Series A Preferred Stock.

29.     CTI did not contact RHP or provide any notice that the cash consideration transaction would take place on March 3, 2008.  RHP first learned that CTI had committed the cash consideration transaction by reading the March 5, 2008 Form 8-K.

30.     The payment of the cash consideration, coupled with the conversion of shares – including the Series A Preferred Stock – that the cash consideration was intended to effect, changed and reduced the Conversion Price for those shareholders to which it was offered. By offering a different and reduced Conversion Price from the Conversion Price explicitly set forth in Section 6(b) of the Series A Designation, the cash consideration transaction constituted a breach of the Series A Designation.

31.     Because the Series A Designation is part of CTI's Articles of Incorporation, the cash consideration transaction further constituted a breach of the Articles of Incorporation.

32.     In addition, Section 4.8 of the Purchase Agreement provides:

4.8     <u>Equal Treatment of Purchasers</u>.  No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration is also offered to all of the parties to the Transaction Documents.  For clarification purposes, this provision constitutes a separate right granted to each Purchaser by the Company and negotiated separately by each Purchaser, and is intended for the Company to treat the Purchasers as a class and shall not in any way be construed as the Purchasers

acting in concert or as a group with respect to the purchase,
disposition or voting of Securities or otherwise.

33.    The cash consideration constitutes "consideration . . . paid to amend or

consent to a . . . modification of" the Conversion Price in the Series A Designation, which is one

of the Transaction Documents.  In the alternative, the cash consideration constituted

consideration paid for the waiver or modification of the right under the Series A Designation

of holders of Series A Preferred Stock to convert their shares at any time and from time to time

after the conversion date, since the consideration was offered in return for immediate conversion

and waiver of such future right.  Because the cash consideration was not offered to all parties to

the Transaction Documents, it violated Section 4.8 of the Purchase Agreement.  Not only did the

cash consideration violate the express language of Section 4.8, but it also violated the spirit of

such provision, which, as stated therein, "is intended for the Company to treat the Purchasers as a

class."

### Breaches of Fiduciary Duties by the Individual Defendants

34.    As officers and directors of CTI, the Individual Defendants owe a

fiduciary duty of care to CTI's shareholders, including RHP.  This duty includes the obligation to

discharge their duties with the care an ordinary prudent person in a like position would exercise

under similar circumstances; an obligation to discharge their duties with a critical eye to

assessing information, performing actions carefully, thoroughly, thoughtfully, and in an informed

manner; and an obligation to seek all relevant material information before making decisions on

behalf of CTI.  The Individual Defendants also have affirmative duties to protect the interest of

CTI's shareholders, including RHP, and be aware of CTI's affairs.  In addition, the Individual

Defendants owe a fiduciary duty of loyalty to CTI's shareholders, including RHP, which requires

that they discharge their duties in good faith.

35.    The Officer Defendants, in their capacity as executive officers of CTI, each reviewed and were aware of the terms of the Series A Designation, including its provisions regarding the Conversion Price.  As alleged above, James Bianco, in his capacity as an executive officer of CTI, signed the Series A Designation on behalf of CTI.

36.    The Officer Defendants, in their capacity as executive officers of CTI, each reviewed and were aware of the terms of the Purchase Agreement, including the "Equal Treatment of Purchasers" provision.  As alleged above, James Bianco, in his capacity as an executive officer of CTI, signed the Purchase Agreement on behalf of CTI.

37.    The Officer Defendants, in their capacity as executive officers of CTI, devised the cash consideration transaction as an attempt to effect an end-run around the contractual and statutory rights of RHP and other Purchasers to which the cash consideration was not offered.  As alleged above, Louis Bianco, in his capacity as an executive officer of CTI, signed the Form 8-K announcing the cash consideration transaction.

38.    The Officer Defendants, in their capacity as executive officers of CTI, obtained an opinion letter that tracks the language set forth in an SEC rule governing public offerings generally, and attached it as an exhibit to the Company's Form 8-K announcing the cash consideration transaction.  (A true and correct copy of the March 3, 2008 opinion letter is attached as Exhibit D.)

39.    The opinion letter, however, did not specifically address the propriety of offering the cash consideration payment only to select Preferred Stock holders of the Company's choosing.  The Officer Defendants in bad faith declined to seek such an opinion, and were instead content to appear to rely on the opinion letter which generally blessed the public offering associated with the cash consideration transaction.

40.    The Officer Defendants, in their capacity as executive officers of CTI, recommended to the Board that CTI enter into the cash consideration transaction, even though they knew the transaction would violate the Purchase Agreement, the Series A Designation, CTI's Articles of Incorporation, and the Washington Business Corporation Act.

41.    The Officer Defendants, in breach of their fiduciary duties, engaged in the foregoing actions knowingly, intentionally, and in bad faith, in an effort to deprive RHP and other Purchasers to which the cash consideration transaction was not offered of their contractual and statutory rights.  The actions of the Officer Defendants were motivated by an actual intent to harm RHP and other Purchasers to which the cash consideration was not offered.

42.    In the alternative, the Officer Defendants, in breach of their fiduciary duties, devised and recommended the cash consideration transaction in grossly negligent, reckless, intentional, conscious, knowing and/or deliberate indifference and disregard to, and in abdication and dereliction of, their obligation to make critical decisions on an informed basis. Upon information and belief, the Officer Defendants in devising and recommending the cash consideration transaction assessed no relevant information and failed to inform themselves as to whether the transaction would result in harm to CTI's shareholders, when even the least bit of consideration, investigation and/or advice would have made it apparent to them that the transaction would result in violations of the Purchase Agreement, the Series A Designation, CTI's Articles of Incorporation, and the Washington Business Corporation Act, and thereby cause harm to RHP and the other Series A Preferred holders to which the cash consideration was not offered.

43.    As alleged above, the Board approved the Series A Designation.  Each of the Non-Management Director Defendants, in their capacity as members of the Board,

participated in the approval of the Series A Designation, and were therefore aware of its terms, including the provisions regarding the Conversion Price.

44.    As alleged above, the Board approved the Purchase Agreement. Each of the Non-Management Director Defendants, in their capacity as members of the Board, participated in the approval of the Purchase Agreement, and were therefore aware of its terms, including the "Equal Treatment of Purchasers" provision.

45.    As alleged above, the Board approved the cash consideration transaction. Each of the Non-Management Director Defendants, in their capacity as members of the Board, participated in the approval of the cash consideration transaction.

46.    The Non-Management Director Defendants approved the cash consideration transaction even though they knew the transaction would violate the Purchase Agreement, the Series A Designation, CTI's Articles of Incorporation, and the Washington Business Corporation Act.

47.    The Non-Management Director Defendants, in breach of their fiduciary duties, approved the cash consideration transaction knowingly, intentionally, and in bad faith, in an effort to deprive RHP and other Purchasers to which the cash consideration transaction was not offered of their contractual and statutory rights. The actions of the Non-Management Director Defendants were motivated by an actual intent to harm RHP and other Purchasers to which the cash consideration was not offered.

48.    In the alternative, the Non-Management Director Defendants, in breach of their fiduciary duties, approved the cash consideration transaction in grossly negligent, reckless, intentional, conscious, knowing, and/or deliberate indifference and disregard to, and in abdication and dereliction of, their obligation to make critical decisions on an informed basis.

Upon information and belief, the Non-Management Director Defendants in approving the cash consideration transaction assessed no relevant information and failed to inform themselves as to whether the transaction would result in harm to CTI's shareholders, when even the least bit of consideration, investigation and/or advice would have made it apparent to them that the transaction would result in violation of the Purchase Agreement, the Series A Designation, CTI's Articles of Incorporation, and the Washington Business Corporation Act, and thereby cause harm to RHP and the other Series A Preferred holders to which the cash consideration was not offered.

49.    The breaches of fiduciary duties by the Individual Defendants other than James Bianco resulted in whole or in part from the fact that such Individual Defendants were beholden or felt a sense of owingness to CTI's principal founder and long-time CEO James Bianco.

50.    As evidence of this fact, despite criticism regarding James Bianco's credibility and complaints that he is incompetent to serve as CEO of the Company, the Board has refused to replace him.  By way of example, CTI's Board, including a number of the Individual Defendants, forced out ex-director Silvano Spinelli, who on August 19, 2005, publicly wrote that he was resigning "due to the denial by the Board of Directors of CTI to replace James Bianco with a more credible and reliable CEO in the interest of shareholders and the company."  (A true and correct copy of the August 19, 2005 letter is attached as Exhibit E.)

51.    The Individual Defendants also have close personal or professional relationships with James Bianco.  By way of example, Louis Bianco is the brother of James Bianco, and James Bianco and Jack Singer served together for many years as faculty at the University of Washington and as members of the Fred Hutchinson Cancer Research Center. Jack Singer lacked independence and relied on James Bianco and Louis Bianco for deciding how

to vote on Board issues because Jack Singer was employed by CTI as its Executive Vice President and Chief Medical Officer and he could not oppose them without jeopardizing his own livelihood.  Upon information and belief, James Bianco and/or Louis Bianco have close personal or professional relationships with the Non-Management Director Defendants, who derived significant benefits of serving and remaining on the Board and receiving compensation, such that the Non-Management Director Defendants lacked the independence to objectively challenge and/or rubber-stamped the recommendations of the Officer Defendants regarding the cash consideration transaction.

52.    As further evidence of their passivity in authorizing the cash consideration transaction, upon information and belief, the Non-Management Director Defendants failed to delegate to any standing committee the task, or form a special committee for the purpose, of inquiring, assessing, and reporting to the Board on whether the cash consideration transaction was unduly preferential to those shareholders to which it was offered, or would violate the contractual and statutory rights of RHP and other shareholders to which it was not offered.  In this regard, the Non-Management Director Defendants further failed to hold and/or to attend informational meetings concerning the cash consideration transaction, yet they promptly ratified or approved the recommendations of the Officer Defendants to whom they were beholden or felt a sense of owingness.

### RHP's Demand for Redemption

53.    Section 9 of the Series A Designation, entitled "Redemption Upon Triggering Events," defines Triggering Event to mean, among other things, any event where CTI "shall fail to observe or perform any other covenant, agreement or warranty contained in, or otherwise commit any breach of the Transaction Documents."

54.     The breaches of the Purchase Agreement and the Series A Designation alleged above constitute a Triggering Event under Section 9(a) of the Series A Designation, pursuant to which RHP has the right to require CTI to redeem all of the Series A Preferred Stock held by RHP for a redemption price equal to the Triggering Redemption Amount, defined as:

> [F]or each share of Series A Preferred Stock, the sum of (i) the greater of (A) 130% of the Stated Value and (B) the product of (a) the VWAP on the Trading Day immediately preceding the date of the Triggering Event and (b) the Stated Value divided by the then Conversion Price, (ii) all accrued unpaid dividends thereon and (iii) all liquidated damages and other costs, expenses or amounts due in respect of the Series A Preferred Stock.

55.     Under Section 9(b) of the Series A Designation, the Triggering Redemption Amount is due and payable "within five Trading Days of the date on which the notice for the payment therefor is provided by a Holder" and accrues "at a rate equal to the lesser of 18% per annum or the maximum rate permitted by applicable law, accruing daily from such date until the Triggering Redemption Amount, plus all such interest thereon, is paid in full."

56.     On March 5, 2008, RHP delivered a letter to CTI setting forth the Triggering Event and demanding immediate wire payment of the Triggering Redemption Amount, in the amount of $326,354.17.  (A true and correct copy of the March 5, 2008 letter is attached as Exhibit F.)

57.     On March 14, 2008, CTI's counsel delivered a letter to RHP refusing to pay such Triggering Redemption Amount.  (A true and correct copy of the March 14, 2008 letter is attached as Exhibit G.)

58.     On March 26, 2008, RHP's counsel delivered a letter to CTI demanding, again, immediate wire payment of the Triggering Redemption Amount, which had increased to $328,475.47.  (A true and correct copy of the March 26, 2008 letter is attached as Exhibit H.)

59.     On April 10, 2008, CTI's counsel delivered a letter to RHP refusing, again, to pay such Triggering Redemption Amount.  (A true and correct copy of the April 10, 2008 letter is attached as Exhibit I.)

### CTI's Obligation to Indemnify

60.     Section 4.5 of the Purchase Agreement, entitled "Indemnification of Purchasers," provides that CTI will indemnify and hold harmless each Purchaser, including RHP, "from any and all…costs and expenses…court costs and reasonable attorneys' fees and costs of investigation that any [Purchaser] may suffer or incur as a result of…any breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or in the other Transaction Documents."

### COUNT I

### Breach of Contract
(Against CTI)

61.     RHP incorporates paragraphs 1 through 60 by reference.

62.     As alleged above, CTI violated both the Purchase Agreement and the Articles of Incorporation, thereby giving rise to CTI's obligation to pay RHP the Triggering Redemption Amount.  Despite RHP's demands, CTI has not paid the Triggering Redemption Amount to RHP as of the date hereof, in breach of the Purchase Agreement and the other Transaction Documents.

63.     Accordingly, CTI is liable to RHP in an amount in excess of $345,122.60, which represents the Triggering Redemption Amount as of July 30, 2008.  Interest on this amount continues to accrue.

## COUNT II

### Violations of Washington Business Corporation Act §§ 23B.06.010 and 23B.06.020
(Against CTI)

64.     RHP incorporates paragraphs 1 through 63 by reference.

65.     The Washington Business Corporation Act mandates that "[a]ll shares of a class must have preferences, limitations, voting powers, and relative rights identical with those of other shares of the same class…." Rev. Code of Washington ("RCW") § 23B.06.010.

66.     Furthermore, RCW § 23B.02.020, entitled "Articles of incorporation", mandates that "[u]nless its articles of incorporation provide otherwise, a corporation is governed by the following provisions:…(f) If more than one class of shares is authorized, all shares of a class must have preferences, limitations, and relative rights identical to those of other shares of the same class under *RCW 23B.06.010*."

67.     CTI violated Washington Business Corporation Act §§ 23B.02.010 and 23B.02.020 by failing to offer the identical consideration to all of the Series A Preferred Stock shareholders and by modifying the Conversion Price for only some of the shares comprising the Series A Preferred Stock class.

68.     As a result of CTI's violations of the Washington Business Corporation Act, RHP has been damaged in an amount to be determined at trial.

### COUNT III

### Breach of Fiduciary Duties
(Against CTI and the Individual Defendants)

69.     RHP incorporates paragraphs 1 through 68 by reference.

70.     As alleged above, the Individual Defendants owe fiduciary duties to CTI's shareholders, including RHP.

71.     As alleged above, the Individual Defendants violated their fiduciary duties in connection with the cash consideration transaction.

72.     As a result of the Individual Defendants' breaches of fiduciary duties, RHP has been damaged in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, RHP requests the Court to enter judgment in its favor and against all defendants:

(a)     Awarding damages in RHP's favor, and against CTI and the Individual Defendants, jointly and severally, in excess of $345,122.60 plus accrued interest, to be determined at trial;

(b)     Awarding RHP its court costs, costs of investigation, attorneys' fees and costs, and interest; and

(c)     Granting such other relief as the Court deems just and proper.

DATED:  July 31, 2008

/s/ Charles L. Rombeau
Charles L. Rombeau (CR 2186)
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
rombeauc@ballardspahr.com
(215) 864-8319

OF COUNSEL:

*Attorneys for Plaintiff RHP Master Fund, Ltd.*

Joel E. Tasca (PA ID No. 81363)
Benjamin M. Schmidt (PA ID No. 205096)
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103
tasca@ballardspahr.com
schmidtb@ballardspahr.com
(215) 864-8188/8136

# EXHIBIT A

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement (this "Agreement") is dated as of February 8th, 2007, among Cell Therapeutics, Inc., a Washington corporation (the "Company"), and each purchaser identified on the signature pages hereto (each, including its successors and assigns, a "Purchaser" and collectively the "Purchasers").

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to an effective registration statement under the Securities Act, the Company desires to issue and sell to each Purchaser, and each Purchaser, severally and not jointly, desires to purchase from the Company, securities of the Company as more fully described in this Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the Company and each Purchaser agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1    Definitions.  In addition to the terms defined elsewhere in this Agreement, (a) capitalized terms that are not otherwise defined herein have the meanings given to such terms in the Certificate of Designation (as defined herein) and (b) the following terms have the meanings set forth in this Section 1.1:

"Action" shall have the meaning ascribed to such term in Section 3.1(j).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person as such terms are used in and construed under Rule 144 under the Securities Act. With respect to a Purchaser, any investment fund or managed account that is managed on a discretionary basis by the same investment manager as such Purchaser will be deemed to be an Affiliate of such Purchaser.

"Authorized Share Approval" means (i) the vote by the shareholders of the company to approve an amendment to the Company's articles or certificate of incorporation that increases the number of authorized shares of Common Stock and authorizes the board of directors of the Company to effect such increase (the "Amendment") and (ii) the filing by the Company of the Amendment with the Secretary of State of the State of Washington and the acceptance of the Amendment by the Secretary of State of the State of Washington.

"Business Day" means any day except Saturday, Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

1

"Certificate of Designation" means the Certificate of Designation filed by the Company with the Secretary of State of the State of Washington prior to the Closing, in the form of Exhibit A attached hereto.

"Closing" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

"Closing Date" means the Trading Day when all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Purchasers' obligations to pay the Subscription Amount and (ii) the Company's obligations to deliver the Preferred Stock and Warrants have been satisfied or waived.

"Commission" means the Securities and Exchange Commission.

"Common Stock" means the common stock of the Company, no par value per share, and any other class of securities into which such securities may hereafter be reclassified or changed into.

"Common Stock Equivalents" means any securities of the Company or the Subsidiaries which would entitle the holder thereof, pursuant to the terms of such securities, to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"Company Counsel" means Heller Ehrman LLP with offices located at 333 Bush Street, San Francisco, California 94104.

"Conversion Price" shall have the meaning ascribed to such term in the Certificate of Designation.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"FWS" means Feldman Weinstein & Smith LLP with offices located at 420 Lexington Avenue, Suite 2620, New York, New York 10170-0002.

"GAAP" shall have the meaning ascribed to such term in Section 3.1(h).

"Indebtedness" means (a) any liabilities for borrowed money or amounts owed in excess of $250,000 (other than trade accounts payable incurred in the ordinary course of business), (b) all guaranties, endorsements and other contingent obligations in respect of Indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (c) the present value of any lease payments in excess of $250,000 due under leases required to be capitalized in accordance with GAAP.

2

"Intellectual Property Rights" shall have the meaning ascribed to such term in Section 3.1(o).

"Liens" means a lien, charge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"Material Adverse Effect" shall have the meaning assigned to such term in Section 3.1(b).

"Material Permits" shall have the meaning ascribed to such term in Section 3.1(l).

"Per Share Purchase Price" equals $1,000, subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of this Agreement.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Preferred Stock" means up to 21,000 shares of the Company's Series A 3% Convertible Preferred Stock issued hereunder having the rights, preferences and privileges set forth in the Certificate of Designation, in the form of Exhibit A hereto.

"Proceeding" means an action, claim, suit, investigation or proceeding.

"Prospectus" means the final prospectus filed for the Registration Statement.

"Prospectus Supplement" means the supplement to the Prospectus complying with Rule 424(b) of the Securities Act that is filed with the Commission and delivered by the Company to each Purchaser at the Closing.

"Purchaser Party" shall have the meaning ascribed to such term in Section 4.5.

"Registration Statement" means the effective registration statement with Commission file No. 333-131533 which registers the sale of the Preferred Stock, the Underlying Shares, the Warrants and the Warrant Shares by the Purchasers.

"Required Approvals" shall have the meaning ascribed to such term in Section 3.1(e).

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"SEC Reports" shall have the meaning ascribed to such term in Section 3.1(h).

"Securities" means the Preferred Stock, the Underlying Shares, the Warrants and the Warrant Shares.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Short Sales" shall include all "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act (but shall be deemed to not include the location and/or reservation of borrowable shares of Common Stock).

"Subscription Amount" means, as to each Purchaser, the aggregate amount to be paid for the Preferred Stock purchased hereunder as specified below such Purchaser's name on the signature page of this Agreement and next to the heading "Subscription Amount," in United States dollars and in immediately available funds.

"Stated Value" means $1,000 per share of Preferred Stock, subject to increase as set forth in Section 3(a) of the Certificate of Designation.

"Trading Day" means a day on which the Common Stock is traded on a Trading Market.

"Trading Market" means the following market on which the Common Stock is listed or quoted for trading on the date in question: the NASDAQ Global Market.

"Transaction Documents" means this Agreement, the Certificate of Designation, the Warrants and any other documents or agreements executed in connection with the transactions contemplated hereunder.

"Underlying Shares" means the shares of Common Stock issued and issuable upon conversion of the Preferred Stock in accordance with the terms of the Certificate of Designation.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Purchasers at the Closing in accordance with Section 2.2(a) hereof, which Warrants shall be exercisable immediately and have a term of exercise equal to 2 years beginning on the date of the Authorized Share Approval, in the form of Exhibit C attached hereto.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

## ARTICLE II.
## PURCHASE AND SALE

2.1    Closing. On the Closing Date, upon the terms and subject to the conditions set forth herein, the Company agrees to sell, and each Purchaser agrees to purchase in the aggregate, severally and not jointly, up to $21,000,000 of Preferred Stock with an aggregate Stated Value equal to such Purchaser's Subscription Amount and Warrants as determined pursuant to Section 2.2(a) at the Per Share Purchase Price. The aggregate number of shares of Preferred Stock sold

4

hereunder shall be up to 21,000. Each Purchaser shall deliver to the Company via wire transfer or certified check immediately available funds equal to its Subscription Amount and the Company shall deliver to each Purchaser its respective shares of Preferred Stock and Warrants as determined pursuant to Section 2.2(a) and the other items set forth in Section 2.2 issuable at the Closing. Upon satisfaction of the conditions set forth in Sections 2.2 and 2.3, the Closing shall occur at the offices of FWS or such other location as the parties shall mutually agree.

    2.2    <u>Deliveries</u>.

    (a)    On or prior to the Closing Date, the Company shall deliver or cause to be delivered to each Purchaser the following:

    (i)    this Agreement duly executed by the Company;

    (ii)    a legal opinion of Company Counsel, substantially in the form of <u>Exhibit B</u> attached hereto;

    (iii)    a number of shares of Preferred Stock equal to such Purchaser's Subscription Amount divided by the Stated Value, registered in the name of such Purchaser;

    (iv)    a Warrant registered in the name of such Purchaser to purchase up to a number of shares of Common Stock equal to 50% of such Purchaser's Subscription Amount divided by $1.6725, with an exercise price equal to $1.61 subject to adjustment therein (such Warrant may be delivered within three Trading Days of the Closing Date), in the form of <u>Exhibit C</u> attached hereto; and

    (v)    the Prospectus and Prospectus Supplement (unless the conditions set forth under Rule 172 under the Securities Act have been satisfied).

    (b)    On or prior to the Closing Date, each Purchaser shall deliver or cause to be delivered to the Company the following:

    (i)    this Agreement duly executed by such Purchaser; and

    (ii)    such Purchaser's Subscription Amount by wire transfer to the account as specified in writing by the Company.

    2.3    <u>Closing Conditions</u>.

    (a)    The obligations of the Company hereunder in connection with the Closing as to any Purchaser are subject to the following conditions being met:

    (i)    the accuracy in all material respects when made and on the Closing Date of the representations and warranties of such Purchaser contained herein;

...

(ii)    all obligations, covenants and agreements of such Purchaser required to be performed at or prior to the Closing Date shall have been performed; and

(iii)   the delivery by such Purchaser of the items set forth in Section 2.2(b) of this Agreement.

(b)    The respective obligations of the Purchasers hereunder in connection with the Closing are subject to the following conditions being met:

(i)    the accuracy in all material respects when made and on the Closing Date of the representations and warranties of the Company contained herein;

(ii)   all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing Date shall have been performed;

(iii)  the delivery by the Company of the items set forth in Section 2.2(a) of this Agreement;

(iv)   there shall have been no Material Adverse Effect with respect to the Company since the date hereof; and

(v)    from the date hereof to the Closing Date, trading in the Common Stock shall not have been suspended by the Commission or the Company's principal Trading Market (except for any suspension of trading of limited duration agreed to by the Company, which suspension shall be terminated prior to the Closing), and, at any time prior to the Closing Date, trading in securities generally as reported by Bloomberg L.P. shall not have been suspended or limited, or minimum prices shall not have been established on securities whose trades are reported by such service, or on any Trading Market, nor shall a banking moratorium have been declared either by the United States or New York State authorities nor shall there have occurred any material outbreak or escalation of hostilities or other national or international calamity of such magnitude in its effect on, or any material adverse change in, any financial market which, in each case, in the reasonable judgment of each Purchaser, makes it impracticable or inadvisable to purchase the Preferred Stock at the Closing.

## ARTICLE III.
### REPRESENTATIONS AND WARRANTIES

3.1    Representations and Warranties of the Company.    Except as set forth in the Prospectus or the Prospectus Supplement, which Prospectus and Prospectus Supplement shall be deemed a part hereof and to qualify any representation or warranty otherwise made herein to the extent of such disclosure, the Company hereby makes the representations and warranties set forth below to each Purchaser:

(a)    Subsidiaries.    All of the direct and indirect subsidiaries (each, a "Subsidiary") of the Company are set forth on the Company's most recently filed Form

6

10-K. The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear of any Liens, and all the issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities.

(b)     Organization and Qualification.     The Company and each of the Subsidiaries is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization (as applicable), with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted. Neither the Company nor any Subsidiary is in violation or default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents. Each of the Company and the Subsidiaries is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, could not have or reasonably be expected to result in (i) a material adverse effect on the legality, validity or enforceability of any Transaction Document, (ii) a material adverse effect on the results of operations, assets, business or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) a material adverse effect on the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document (any of (i), (ii) or (iii), a "Material Adverse Effect") and no Proceeding has been instituted in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification.

(c)     Authorization; Enforcement.     The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by each of the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of each of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of the Company and no further action is required by the Company, its board of directors or its stockholders in connection therewith other than in connection with the Required Approvals. Each Transaction Document has been (or upon delivery will have been) duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(d)     No Conflicts. The execution, delivery and performance of the Transaction Documents by the Company, the issuance and sale of the Securities and the consummation by the Company of the other transactions contemplated hereby and thereby do not and will not (i) conflict with or violate any provision of the Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or

7

charter documents, or (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of the Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing a Company or Subsidiary debt or otherwise) or other understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected or (iii) subject to the Required Approvals, conflict with or result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Company or a Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the Company or a Subsidiary is bound or affected, except in the case of each of clauses (ii) and (iii), such as could not have or reasonably be expected to result in a Material Adverse Effect.

(e)     Filings, Consents and Approvals.  The Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person or other entity of any kind, including, without limitation, any Trading Market, in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than any filings required to be made under applicable federal and state securities laws (collectively, the "Required Approvals").

(f)     Issuance of the Securities.  The Preferred Stock and the Warrants are duly authorized and, when issued and paid for in accordance with the applicable Transaction Documents, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company.  The Warrant Shares, when issued in accordance with the terms of the Warrants, will be validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company.  The Company has reserved from its duly authorized capital stock the shares of Common Stock issuable upon conversion of the Preferred Stock.  The Securities are being issued pursuant to the Registration Statement and the issuance of the Securities has been registered by the Company under the Securities Act.  The Registration Statement is effective and available for the issuance of the Securities thereunder and the Company has not received any notice that the Commission has issued or intends to issue a stop-order with respect to the Registration Statement or that the Commission otherwise has suspended or withdrawn the effectiveness of the Registration Statement, either temporarily or permanently, or intends or has threatened in writing to do so.  The "Plan of Distribution" section under the Registration Statement permits the issuance of the Securities hereunder.  Upon receipt of the Preferred Stock and the Warrants and, upon respective conversion of the Preferred Stock and exercise of the Warrants, the Underlying Shares and the Warrant Shares, the Purchasers will have good and marketable title to such Securities and the Underlying Shares and Warrant Shares will be freely tradable on the Trading Market.

(g)     Capitalization.  The capitalization of the Company is substantially as set forth in, or as incorporated by reference into, the Registration Statement.  Except as set forth in the SEC Reports, the Company has not issued any capital stock since its most

8

recently filed periodic report under the Exchange Act, other than pursuant to the exercise of employee stock options under the Company's stock option plans, the issuance of shares of Common Stock to employees pursuant to the Company's employee stock purchase plan and pursuant to the conversion or exercise of Common Stock Equivalents outstanding as of the date of the most recently filed periodic report under the Exchange Act. No Person has any right of first refusal, preemptive right, right of participation or any similar right to participate in the transactions contemplated by the Transaction Documents. Except as a result of the purchase and sale of the Securities, there are no outstanding options, warrants, scrip rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire, any shares of Common Stock, or contracts, commitments, understandings or arrangements by which the Company or any Subsidiary is or may become bound to issue additional shares of Common Stock or Common Stock Equivalents. The issuance and sale of the Securities will not obligate the Company to issue shares of Common Stock or other securities to any Person (other than the Purchasers) and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under any of such securities. All of the outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities. No further approval or authorization of any stockholder, the Board of Directors of the Company or others is required for the issuance and sale of the Securities. There are no stockholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's stockholders.

(h) SEC Reports; Financial Statements. The Company has complied in all material respects with requirements to file all reports, schedules, forms, statements and other documents required to be filed by it under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date hereof (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein being collectively referred to herein as the "SEC Reports") on a timely basis or has received a valid extension of such time of filing and has filed any such SEC Reports prior to the expiration of any such extension. As of their respective dates, the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with United States generally accepted accounting principles ("GAAP") applied on a consistent basis during the periods involved, except as may be otherwise specified in such financial statements or the notes thereto and except that

unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments.

(i)    Material Changes; Undisclosed Events, Liabilities or Developments. Since the date of the latest audited financial statements included within the SEC Reports, except as specifically disclosed in the SEC Reports or the Prospectus Supplement, (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect, (ii) the Company has not incurred any liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or required to be disclosed in filings made with the Commission, (iii) the Company has not altered its method of accounting, (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock and (v) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company stock option plans. The Company does not have pending before the Commission any request for confidential treatment of information. Except for the issuance of the Securities contemplated by this Agreement or as set forth in the Prospectus Supplement, no event, liability or development has occurred or exists with respect to the Company or its Subsidiaries or their respective business, properties, operations or financial condition, that would be required to be disclosed by the Company under applicable securities laws at the time this representation is made that has not been publicly disclosed at least 1 Trading Day prior to the date that this representation is made.

(j)    Litigation. Except as disclosed in the Registration Statement or the Prospectus Supplement, there is no Proceeding pending or, to the knowledge of the Company, threatened against or affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which (i) adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities or (ii) could, if there were an unfavorable decision, reasonably be expected to result in a Material Adverse Effect. Except as disclosed in the Registration Statement or the Prospectus Supplement, neither the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty. There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission involving the Company or any current or former director or officer of the Company. The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Securities Act.

10

(k)     Labor Relations. No material labor dispute exists or, to the knowledge of the Company, is imminent with respect to any of the employees of the Company which could reasonably be expected to result in a Material Adverse Effect. The Company and its Subsidiaries believe that their relationships with their employees are good. No executive officer, to the knowledge of the Company, is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant, and the continued employment of each such executive officer does not subject the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters. The Company and its Subsidiaries are in compliance with all U.S. federal, state, local and foreign laws and regulations relating to employment and employment practices, terms and conditions of employment and wages and hours, except where the failure to be in compliance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(l)     Compliance. Neither the Company nor any Subsidiary (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any Subsidiary under), nor has the Company or any Subsidiary received notice of a claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is in violation of any order of any court, arbitrator or governmental body, or (iii) is or has been in violation of any statute, rule or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws applicable to its business and all such laws that affect the environment, except in each case as could not reasonably be expected to have a Material Adverse Effect.

(m)     Regulatory Permits. The Company and the Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses as described in the SEC Reports, except where the failure to possess such permits could not have or reasonably be expected to result in a Material Adverse Effect ("Material Permits"), and neither the Company nor any Subsidiary has received any notice of proceedings relating to the revocation or modification of any Material Permit.

(n)     Title to Assets. The Company and the Subsidiaries have good and marketable title in fee simple to all real property owned by them that is material to the business of the Company and the Subsidiaries and good and marketable title in all personal property owned by them that is material to the business of the Company and the Subsidiaries, in each case free and clear of all Liens, except for Liens as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and the Subsidiaries and Liens for the payment of federal, state or other taxes, the payment of which is neither delinquent nor subject to penalties. Any real property and facilities held under lease by the Company and the Subsidiaries are held by them under valid, subsisting and enforceable leases with which the Company and the Subsidiaries are in compliance.

11

(o)     Patents and Trademarks. The Company and the Subsidiaries have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and other similar intellectual property rights currently employed by them in connection with the business currently operated by them that are necessary for use in the conduct of their respective businesses as described in the SEC Reports, except where the failure to so have could not reasonably be expected to have a Material Adverse Effect (collectively, the "Intellectual Property Rights"). Neither the Company nor any Subsidiary has received any written notice that the Intellectual Property Rights used by the Company or any Subsidiary violates or infringes upon the rights of any Person.

(p)     Insurance. The Company and the Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which the Company and the Subsidiaries are engaged, including, but not limited to, directors and officers insurance coverage. To the best knowledge of the Company, such insurance contracts are accurate and complete. Neither the Company nor any Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without a significant increase in cost.

(q)     Transactions With Affiliates and Employees. Except as set forth in the SEC Reports, none of the officers or directors of the Company and, to the knowledge of the Company, none of the employees of the Company is presently a party to any transaction with the Company or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, other than for (i) payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including restricted stock programs and stock option agreements under any stock option plan of the Company.

(r)     Sarbanes-Oxley. The Company is in material compliance with all provisions of the Sarbanes-Oxley Act of 2002 which are applicable to it as of the date hereof and of the Closing Date.

(s)     Certain Fees. Except as set forth in the Prospectus Supplement, no brokerage or finder's fees or commissions are or will be payable by the Company to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents.

(t)     Investment Company. The Company is not, and immediately after receipt of payment for the Securities will not be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(u)     Registration Rights. No Person has any right to cause the Company to effect the registration under the Securities Act of any securities of the Company, which rights are currently not satisfied.

(v)     Listing and Maintenance Requirements. The Company's Common Stock is registered pursuant to Section 12(b) or 12(g) of the Exchange Act, and the Company has taken no action designed to, or which to its knowledge is likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act nor has the Company received any notification that the Commission is contemplating terminating such registration. The Company has not, in the 12 months preceding the date hereof, received notice from any Trading Market on which the Common Stock is or has been listed or quoted to the effect that the Company is not in compliance with the listing or maintenance requirements of such Trading Market. The Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with all such listing and maintenance requirements.

(w)     Application of Takeover Protections. The Company and its Board of Directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's Certificate of Incorporation (or similar charter documents) or the laws of its state of incorporation that is or could become applicable to the Purchasers as a result of the Purchasers and the Company fulfilling their obligations or exercising their rights under the Transaction Documents, including without limitation as a result of the Company's issuance of the Securities and the Purchasers' ownership of the Securities.

(x)     Trading Market Rules. The issuance and sale of the Securities hereunder does not contravene the rules and regulations of the Trading Market.

(y)     Solvency. Based on the financial condition of the Company as of the Closing Date after giving effect to the receipt by the Company of the proceeds from the sale of the Securities hereunder, during the next 12 months, the Company's assets do not constitute unreasonably small capital to carry on its business as now conducted and as proposed to be conducted including its capital needs taking into account the particular capital requirements of the business conducted by the Company, and projected capital requirements and capital availability thereof. The Company has no knowledge of any facts or circumstances which lead it to believe that it will file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within one year from the Closing Date. The SEC Reports set forth as of the dates thereof all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments. Neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

13

(z)    Tax Status.  Except for matters that could not, individually or in the aggregate, have or reasonably be expected to result in a Material Adverse Effect, the Company and each Subsidiary has filed all necessary federal, state and foreign income and franchise tax returns and has paid or accrued all taxes shown as due thereon, and the Company has no knowledge of a tax deficiency which has been asserted or threatened against the Company or any Subsidiary.

(aa)    Foreign Corrupt Practices.  Neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is  in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

(bb)    Accountants.  To the knowledge of the Company, Stonefield Josephson, Inc. (i) is a registered public accounting firm as required by the Exchange Act and (ii) shall express its opinion with respect to the financial statements to be included in the Company's Annual Report on Form 10-K for the year ending December 31, 2006.

(cc)    Acknowledgment Regarding Purchasers' Purchase of Securities.  The Company acknowledges and agrees that each of the Purchasers is acting solely in the capacity of an arm's length purchaser with respect to the Transaction Documents and the transactions contemplated thereby.    The Company further acknowledges that no Purchaser is acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated thereby and any advice given by any Purchaser or any of their respective representatives or agents in connection with the Transaction Documents and the transactions contemplated thereby is merely incidental to the Purchasers' purchase of the Securities. The Company further represents to each Purchaser that the Company's decision to enter into this Agreement and the other Transaction Documents has been based solely on the independent evaluation of the transactions contemplated hereby by the Company and its representatives.

(dd)    Acknowledgement Regarding Purchasers' Trading Activity.  Anything in this Agreement or elsewhere herein to the contrary notwithstanding (except for Sections 3.2(e) and 4.10 hereof), it is understood and acknowledged by the Company (i) that none of the Purchasers have been asked to agree, nor has any Purchaser agreed, to desist from purchasing or selling, long and/or short, securities of the Company, or "derivative" securities based on securities issued by the Company or to hold the Securities for any specified term; (ii) that past or future open market or other transactions by any Purchaser, including Short Sales, and specifically including, without limitation, Short Sales or "derivative" transactions, before or after the closing of this or future transactions, may negatively impact the market price of the Company's publicly-traded securities; (iii) that any Purchaser, and counter-parties in "derivative" transactions to which any such

14

Purchaser is a party, directly or indirectly, presently may have a "short" position in the Common Stock, and (iv) that each Purchaser shall not be deemed to have any affiliation with or control over any arm's length counter-party in any "derivative" transaction. The Company further understands and acknowledges that (a) one or more Purchasers may engage in hedging activities at various times during the period that the Securities are outstanding, including, without limitation, during the periods that the value of the Warrant Shares deliverable with respect to the exercise of the Warrant are being determined and (b) such hedging activities (if any) could reduce the value of the existing stockholders' equity interests in the Company at and after the time that the hedging activities are being conducted. The Company acknowledges that such aforementioned hedging activities do not constitute a breach of any of the Transaction Documents.

(ee)    Regulation M Compliance. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent in connection with the placement of the Securities.

3.2    Representations and Warranties of the Purchasers. Each Purchaser, for itself and for no other Purchaser, hereby represents and warrants as of the date hereof and as of the Closing Date to the Company as follows:

(a)    Organization; Authority.  Such Purchaser is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with full right, corporate or partnership power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution, delivery and performance by such Purchaser of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate or similar action on the part of such Purchaser. Each Transaction Document to which it is a party has been duly executed by such Purchaser, and when delivered by such Purchaser in accordance with the terms hereof, will constitute the valid and legally binding obligation of such Purchaser, enforceable against it in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(b)    Own Account. Such Purchaser is acquiring the Securities as principal for its own account and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Securities in violation of the

15

Securities Act or any applicable state securities law and has no direct or indirect arrangement or understandings with any other Persons to distribute or regarding the distribution of such Securities (this representation and warranty not limiting such Purchaser's right to sell the Securities in compliance with applicable federal and state securities laws) in violation of the Securities Act or any applicable state securities law. Such Purchaser is acquiring the Securities hereunder in the ordinary course of its business.

(c)     Purchaser Status. At the time such Purchaser was offered the Securities, it was, and at the date hereof it is, either: (i) an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act or (ii) a "qualified institutional buyer" as defined in Rule 144A(a) under the Securities Act. Such Purchaser is not required to be registered as a broker-dealer under Section 15 of the Exchange Act.

(d)     Experience of Such Purchaser. Such Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Such Purchaser is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment. Such Purchaser understands that nothing in the Agreement or any other materials presented to the Purchaser in connection with the purchase and sale of the Securities constitutes legal, tax or investment advice. Such Purchaser acknowledges that it must rely on legal, tax and investment advisors of its own choosing in connection with its purchase of the Securities.

(e)     Short Sales and Confidentiality Prior To The Date Hereof. Other than the transactions contemplated hereunder, such Purchaser has not directly or indirectly, nor has any Person acting on behalf of or pursuant to any understanding with such Purchaser, executed any disposition, including Short Sales, in the securities of the Company during the period commencing from the time that such Purchaser first received a term sheet (written or oral) from the Company or any other Person setting forth the material terms of the transactions contemplated hereunder until the date hereof ("Discussion Time"). Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the representation set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement. Other than to other Persons party to this Agreement, such Purchaser has maintained the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction).

(f)     No Government Review. Such Purchaser understands that no United States federal or state agency or any other government or governmental agency has

16

passed upon or made any recommendation or endorsement of the Securities purchased hereunder.

(g)     No Intent to Effect a Change of Control. Such Purchaser has no present intent to effect a "change of control" of the Company as such term is understood under the rules promulgated pursuant to Section 13(d) of the Exchange Act.

## ARTICLE IV.
## OTHER AGREEMENTS OF THE PARTIES

4.1     Integration. The Company shall not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Securities for purposes of the rules and regulations of any Trading Market such that it would require shareholder approval prior to the closing of such other transaction unless shareholder approval is obtained before the closing of such subsequent transaction.

4.2     Securities Laws Disclosure; Publicity. The Company shall (a) by 8:30 a.m. (New York City time) on the Trading Day immediately following the date hereof, issue a press release disclosing the material terms of the transactions contemplated hereby, and (b) by 8:30 a.m. (New York City time) on the third Trading Day following the date hereof, file a Current Report on Form 8-K disclosing the material terms of the transactions contemplated hereby and including the Transaction Documents as exhibits thereto. The Company and each Purchaser shall consult with each other in issuing any other press releases with respect to the transactions contemplated hereby, and, except as may be required by law, neither the Company nor any Purchaser shall issue any such press release or otherwise make any such public statement without the prior consent of the Company, with respect to any press release of any Purchaser, or without the prior consent of each Purchaser, with respect to any press release of the Company, which consent shall not unreasonably be withheld or delayed, except if such disclosure is required by law, in which case the disclosing party shall promptly provide the other party with prior notice of such public statement or communication. Notwithstanding the foregoing, the Company shall not publicly disclose the name of any Purchaser, or include the name of any Purchaser in any filing with the Commission or any regulatory agency or Trading Market, without the prior written consent of such Purchaser, except (i) as required by federal securities law in connection with the filing of final Transaction Documents (including signature pages thereto) with the Commission and (ii) to the extent such disclosure is required by law or Trading Market regulations, in which case the Company shall provide the Purchasers with prior notice of such disclosure permitted under this subclause (ii).

4.3     Non-Public Information. Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company covenants and agrees that neither it nor any other Person acting on its behalf will provide any Purchaser or its agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto such Purchaser shall have executed a written agreement regarding the confidentiality and use of such information. The Company understands and confirms that each Purchaser shall be relying on the foregoing representations in effecting transactions in securities of the Company.

17

4.4     Use of Proceeds. The use of proceeds shall be as described in the Prospectus Supplement.

4.5     Indemnification of Purchasers. Subject to the provisions of this Section 4.5, the Company will indemnify and hold each Purchaser and its directors, officers, shareholders, members, partners, employees and agents (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title), each Person who controls such Purchaser (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, shareholders, agents, members, partners or employees (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title) of such controlling persons (each, a "Purchaser Party") harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation that any such Purchaser Party may suffer or incur as a result of or relating to (a) any breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or in the other Transaction Documents or (b) any action instituted against a Purchaser, or any of them or their respective Affiliates, by any stockholder of the Company who is not an Affiliate of such Purchaser, with respect to any of the transactions contemplated by the Transaction Documents (unless such action is based upon a breach of such Purchaser's representations, warranties or covenants under the Transaction Documents or any agreements or understandings such Purchaser may have with any such stockholder or any violations by the Purchaser of state or federal securities laws or any conduct by such Purchaser which constitutes fraud, gross negligence, willful misconduct or malfeasance). If any action shall be brought against any Purchaser Party in respect of which indemnity may be sought pursuant to this Agreement, such Purchaser Party shall promptly notify the Company in writing, and the Company shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the Purchaser Party. Any Purchaser Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Purchaser Party except to the extent that (i) the employment thereof has been specifically authorized by the Company in writing, (ii) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of such separate counsel, a material conflict on any material issue between the position of the Company and the position of such Purchaser Party, in which case the Company shall be responsible for the reasonable fees and expenses of no more than one such separate counsel. The Company will not be liable to any Purchaser Party under this Agreement (i) for any settlement by a Purchaser Party effected without the Company's prior written consent, which shall not be unreasonably withheld or delayed or (ii) to the extent, but only to the extent that a loss, claim, damage or liability is attributable to any Purchaser Party's breach of any of the representations, warranties, covenants or agreements made by such Purchaser Party in this Agreement or in the other Transaction Documents.

4.6     Reservation of Common Stock. As of the date of the date hereof the Company has reserved and the Company shall continue to reserve and keep available at all times, free of preemptive rights, a sufficient number of shares of Common Stock for the purpose of enabling the Company to issue all of the Underlying Shares underlying the Preferred Stock and following the date of the Authorized Share Approval, the Company will have reserved and the Company

shall continue to reserve and keep available at all times, free of preemptive rights, a sufficient number of shares of Common Stock for the purpose of enabling the Company to issue all of the Underlying Shares issuable pursuant to the Preferred Stock and the Warrants in full.

4.7     Listing of Common Stock.   The Company hereby agrees to use commercially reasonable best efforts to maintain the listing of the Common Stock on a Trading Market, and as soon as reasonably practicable following the Closing (but not later than the Closing Date) to list all of the Underlying Shares and Warrant Shares on such Trading Market. The Company further agrees that if the Company applies to have the Common Stock traded on any other Trading Market, it will include in such application all of the Underlying Shares and Warrant Shares, and will take such other action as is necessary to cause all of the Underlying Shares and Warrant Shares to be listed on such other Trading Market as promptly as possible.   The Company will take all action reasonably necessary to continue the listing and trading of its Common Stock on a Trading Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Trading Market.

4.8     Equal Treatment of Purchasers.   No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration is also offered to all of the parties to the Transaction Documents.  For clarification purposes, this provision constitutes a separate right granted to each Purchaser by the Company and negotiated separately by each Purchaser, and is intended for the Company to treat the Purchasers as a class and shall not in any way be construed as the Purchasers acting in concert or as a group with respect to the purchase, disposition or voting of Securities or otherwise.

4.9     Increase in Authorized Common Stock.   The Company agrees to call a special meeting of shareholders (which may also be at the annual meeting of shareholders) within 90 calendar days of the date hereof for the purpose of obtaining Authorized Share Approval, with the recommendation of the Company's Board of Directors that such proposal is approved, and the Company shall solicit proxies from its shareholders in connection therewith in the same manner as all other management proposals in such proxy statement and all management-appointed proxyholders shall vote their proxies in favor of such proposal. If the Company does not obtain Authorized Share Approval at the first meeting, the Company shall call a meeting every 4 months thereafter to seek Authorized Share Approval until the earlier of the date Authorized Share Approval is obtained or the date on which no Warrants remain outstanding. The Company shall notify the Purchasers promptly upon receipt of Authorized Share Approval.

4.10    Short Sales and Confidentiality After The Date Hereof.   Each Purchaser, severally and not jointly with the other Purchasers, covenants that neither it nor any Affiliate acting on its behalf or pursuant to any understanding with it will execute any Short Sales during the period commencing at the Discussion Time and ending at the time that the transactions contemplated by this Agreement are first publicly announced as described in Section 4.2.  Each Purchaser, severally and not jointly with the other Purchasers, covenants that until such time as the transactions contemplated by this Agreement are publicly disclosed by the Company as described in Section 4.2, such Purchaser will maintain the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction). Notwithstanding the foregoing, no Purchaser makes any representation, warranty or covenant

19

hereby that it will not engage in Short Sales in the securities of the Company after the time that the transactions contemplated by this Agreement are first publicly announced as described in Section 4.2. Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the covenant set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement.

4.11    Delivery of Securities After Closing. The Company shall deliver, or cause to be delivered, the respective Securities purchased by each Purchaser to such Purchaser within 3 Trading Days of the Closing Date.

4.12    Effectiveness of Registration Statement. Until the date that is 60 calendar days after the expiration of the Warrants (but not earlier than 2 years from the Closing Date), the Company shall maintain the effectiveness of a registration statement to permit the Company to issue the Underlying Shares and the Warrant Shares or else to permit the Purchasers to resell the Securities.

## ARTICLE V.
## MISCELLANEOUS

5.1    Termination. This Agreement may be terminated by any Purchaser, as to such Purchaser's obligations hereunder only and without any effect whatsoever on the obligations between the Company and the other Purchasers, by written notice to the other parties, if the Closing has not been consummated on or before February16, 2007; provided, however, that no such termination will affect the right of any party to sue for any breach by the other party (or parties).

5.2    Fees and Expenses. Except as expressly set forth in the Transaction Documents to the contrary, each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement. The Company shall pay all transfer agent fees, stamp taxes and other taxes and duties levied in connection with the delivery of any Securities to the Purchasers.

5.3    Entire Agreement. The Transaction Documents, together with the exhibits and schedules thereto, the Prospectus and the Prospectus Supplement, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

5.4    Notices. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (a) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto prior to 5:30

p.m. (New York City time) on a Trading Day, (b) the next Trading Day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto on a day that is not a Trading Day or later than 5:30 p.m. (New York City time) on any Trading Day, (c) the second Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service, or (d) upon actual receipt by the party to whom such notice is required to be given. The address for such notices and communications shall be as set forth on the signature pages attached hereto.

5.5     Amendments; Waivers.  No provision of this Agreement may be waived or amended except in a written instrument signed, in the case of an amendment, by the Company and each Purchaser or, in the case of a waiver, by the party against whom enforcement of any such waived provision is sought.  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right.

5.6     Headings.  The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

5.7     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.  The Company may not assign this Agreement or any rights or obligations hereunder without the prior written consent of each Purchaser (other than by merger).  Any Purchaser may assign any or all of its rights under this Agreement to any Person to whom such Purchaser assigns or transfers any Securities, provided such transferee agrees in writing to be bound, with respect to the transferred Securities, by the provisions of the Transaction Documents that apply to the "Purchasers".

5.8     No Third-Party Beneficiaries.  This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, except as otherwise set forth in Section 4.5.

5.9     Governing Law.  All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof.  Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is

improper or is an inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The parties hereby waive all rights to a trial by jury. If either party shall commence an action or proceeding to enforce any provisions of the Transaction Documents, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding.

5.10    Survival. The representations and warranties contained herein shall survive the Closing and the delivery of the Shares and Warrant Shares for a period of two years.

5.11    Execution. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

5.12    Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

5.13    Rescission and Withdrawal Right. Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) any of the other Transaction Documents, whenever any Purchaser exercises a right, election, demand or option under a Transaction Document and the Company does not timely perform its related obligations within the periods therein provided, then such Purchaser may rescind or withdraw, in its sole discretion from time to time upon written notice to the Company, any relevant notice, demand or election in whole or in part without prejudice to its future actions and rights.

5.14    Replacement of Securities. If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof (in the case of mutilation), or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction. The applicant for a

22

new certificate or instrument under such circumstances shall also pay any reasonable third-party costs (including customary indemnity) associated with the issuance of such replacement Securities.

    5.15   Remedies. In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be entitled to specific performance under the Transaction Documents. The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agrees to waive and not to assert in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

    5.16   Independent Nature of Purchasers' Obligations and Rights. The obligations of each Purchaser under any Transaction Document are several and not joint with the obligations of any other Purchaser, and no Purchaser shall be responsible in any way for the performance or non-performance of the obligations of any other Purchaser under any Transaction Document. Nothing contained herein or in any other Transaction Document, and no action taken by any Purchaser pursuant thereto, shall be deemed to constitute the Purchasers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Purchasers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. Each Purchaser shall be entitled to independently protect and enforce its rights, including without limitation, the rights arising out of this Agreement or out of the other Transaction Documents, and it shall not be necessary for any other Purchaser to be joined as an additional party in any proceeding for such purpose. Each Purchaser has been represented by its own separate legal counsel in their review and negotiation of the Transaction Documents. For reasons of administrative convenience only, Purchasers and their respective counsel have chosen to communicate with the Company through FWS. FWS does not represent any of the Purchasers but only Rodman & Renshaw, LLC, which has acted as placement agent to the transaction. The Company has elected to provide all Purchasers with the same terms and Transaction Documents for the convenience of the Company and not because it was required or requested to do so by the Purchasers.

    5.17   Liquidated Damages. The Company's obligations to pay any partial liquidated damages or other amounts owing under the Transaction Documents is a continuing obligation of the Company and shall not terminate until all unpaid partial liquidated damages and other amounts have been paid notwithstanding the fact that the instrument or security pursuant to which such partial liquidated damages or other amounts are due and payable shall have been canceled.

    5.18   Construction. The parties agree that each of them and/or their respective counsel has reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments hereto.

*(Signature Pages Follow)*

23

[PURCHASER SIGNATURE PAGES TO CTIC SECURITIES PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: _RHP Master Fund, Ltd._

Signature of Authorized Signatory of Purchaser: RHP Master Fund, Ltd.
By: Rock Hill Investment Manage...
By: RHP General Partner, ...

Name of Authorized Signatory: _____ By: KATH MARLOWE Its: Managing ... INVESTOR

Title of Authorized Signatory: _____

Email Address of Purchaser: _kmarlowe @ ruckhill funds. com_

Fax Number of Purchaser: _610 - 949 - 9600_

Address for Notice of Purchaser:    c/o Rock Hill Investment Management, L.P.
                                     Three Bala Plaza - East, Suite 585
                                     Bala Cynwyd, PA  19004
                                     ph  610 -949- 9700

Address for Delivery of Securities for Purchaser (if not same as address for notice):

Subscription Amount: $ _250,000.00_

Shares of Preferred Stock: _____250_____

Warrant Shares: _74,738_____

EIN Number: **[PROVIDE THIS UNDER SEPARATE COVER]**

[SIGNATURE PAGES CONTINUE]

26

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**CELL THERAPEUTICS, INC.**

By: _____
Name: James A. Bianco, M.D.
Title: President and Chief Executive Officer

Address for Notice:

501 Elliot Avenue West, Suite 400
Seattle, Washington 98119
Facsimile: (206) 272-4302
Attention: Louis A. Bianco

With a copy to (which shall not constitute notice):

Heller Ehrman LLP
333 Bush Street
San Francisco, CA 94104
Facsimile: (415) 772-6268
Attention: Karen Dempsey, Esq.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOR PURCHASER FOLLOWS]

# EXHIBIT B



# UNITED STATES OF AMERICA
# The State of Washington

## Secretary of State

I, **Sam Reed,** Secretary of State of the State of Washington and custodian of its seal, hereby issue this

certificate that the attached is a true and correct copy of

ARTICLES OF AMENDMENT

of

CELL THERAPEUTICS, INC.

as filed in this office on February 9, 2007.

Date:    February 9, 2007



Given under my hand and the Seal of the State
of Washington at Olympia, the State Capital

Sam Reed, Secretary of State

02/09/07 1000264-001
$70.00 K #109492
tid:1244246

### ARTICLES OF AMENDMENT TO
### AMENDED AND RESTATED ARTICLES OF
### CELL THERAPEUTICS, INC.

FILED
SECRETARY OF STATE

### DESIGNATION OF PREFERENCES,
### RIGHTS AND LIMITATIONS
### OF
### SERIES A 3% CONVERTIBLE PREFERRED STOCK

FEB 09 2007

STATE OF WASHINGTON

Pursuant to the Washington Business Corporation Act, Chapter 23B.10, the undersigned, officer of Cell Therapeutics, Inc., a Washington corporation (hereinafter called the "Corporation"), does hereby submit for filing these Articles of Amendment:

FIRST: The name of the Corporation is Cell Therapeutics, Inc.

SECOND: This amendment to the Amended and Restated Articles of Incorporation, as amended to date (the "Restated Articles") was adopted by the Board of Directors of the Corporation on February 8, 2007. Shareholder action was not required on this amendment pursuant to Article II.2 of the Restated Articles.

THIRD: A new Section 2(b) of Article II is added to the Restated Articles to add the designations, rights and preferences of a new series of preferred stock as follows:

"(b) Series A 3% Convertible Preferred Stock"

### TERMS OF PREFERRED STOCK

Section 1.    Definitions. Capitalized terms used and not otherwise defined herein that are defined in the Purchase Agreement shall have the meanings given such terms in the Purchase Agreement. For the purposes hereof, the following terms shall have the following meanings:

"Alternate Consideration" shall have the meaning set forth in Section 7(e).

"Bankruptcy Event" means any of the following events: (a) the Corporation or any Significant Subsidiary (as such term is defined in Rule 1-02(w) of Regulation S-X) thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Corporation or any Significant Subsidiary thereof; (b) there is commenced against the Corporation or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement; (c) the Corporation or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered; (d) the Corporation or any Significant Subsidiary thereof suffers

1

any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment; (e) the Corporation or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors; (f) the Corporation or any Significant Subsidiary thereof calls a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts; or (g) the Corporation or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day except Saturday, Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Buy-In" shall have the meaning set forth in Section 6(e)(iii).

"Change of Control Transaction" means the occurrence after the date hereof of any of (i) an acquisition by an individual, legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Corporation, by contract or otherwise) of in excess of 33% of the voting securities of the Corporation (other than by means of conversion or exercise of Series A Preferred Stock and the Warrants issued together with the Series A Preferred Stock), or (ii) the Corporation merges into or consolidates with any other Person, or any Person merges into or consolidates with the Corporation and, after giving effect to such transaction, the shareholders of the Corporation immediately prior to such transaction own less than 66% of the aggregate voting power of the Corporation or the successor entity of such transaction, or (iii) the Corporation sells or transfers all or substantially all of its assets to another Person and the shareholders of the Corporation immediately prior to such transaction own less than 66% of the aggregate voting power of the acquiring entity immediately after the transaction, or (iv) a replacement at one time or within a one year period of more than one-half of the members of the Corporation's board of directors which is not approved by a majority of those individuals who are members of the board of directors on the date hereof (or by those individuals who are serving as members of the board of directors on any date whose nomination to the board of directors was approved by a majority of the members of the board of directors who are members on the date hereof), or (v) the execution by the Corporation of an agreement to which the Corporation is a party or by which it is bound, providing for any of the events set forth in clauses (i) through (iv) herein.

"Closing Date" means the Trading Day when all of the Transaction Documents have been executed and delivered by the applicable parties thereto and all conditions precedent to (i) each Holder's obligations to pay the Subscription Amount and (ii) the Corporation's obligations to deliver the Securities have been satisfied or waived.

2

"Commission" means the Securities and Exchange Commission.

"Common Stock" means the Corporation's common stock, no par value per share, and stock of any other class of securities into which such securities may hereafter be reclassified or changed into.

"Common Stock Equivalents" means any securities of the Corporation or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"Conversion Amount" means the sum of the Stated Value at issue.

"Conversion Date" shall have the meaning set forth in Section 6(a).

"Conversion Price" shall have the meaning set forth in Section 6(b).

"Conversion Shares" means, collectively, the shares of Common Stock issuable upon conversion of the shares of Series A Preferred Stock in accordance with the terms hereof.

"Dividend Payment Date" shall have the meaning set forth in Section 3(a).

"Equity Conditions" means, during the period in question, (i) the Corporation shall have duly honored all conversions scheduled to occur or occurring by virtue of one or more Notices of Conversion of the applicable Holder on or prior to the dates so requested or required, if any, (ii) the Corporation shall have paid all liquidated damages and other amounts owing to the applicable Holder in respect of the Series A Preferred Stock, (iii) there is an effective Registration Statement pursuant to which the Company is permitted to issue the Conversion Shares or the Holders are permitted to utilize the prospectus thereunder to resell all of the shares of Common Stock issuable pursuant to the Transaction Documents (and the Corporation believes, in good faith, that such effectiveness will continue uninterrupted for the foreseeable future), (iv) the Common Stock is trading on a Trading Market and all of the shares issuable pursuant to the Transaction Documents are listed for trading on such Trading Market (and the Corporation believes, in good faith, that trading of the Common Stock on a Trading Market will continue uninterrupted for the foreseeable future), (v) there is a sufficient number of authorized, but unissued and otherwise unreserved, shares of Common Stock for the issuance of all of the shares of Common Stock issuable pursuant to the Transaction Documents, (vi) there is no existing Triggering Event or no existing event which, with the passage of time or the giving of notice, would constitute a Triggering Event, (vii) the issuance of the shares in question to the applicable Holder would not violate the limitations set forth in Section 6(c) herein, (viii) there has been no public announcement of a pending or proposed Fundamental Transaction or Change of Control

3

Transaction that has not been consummated and (ix) the applicable Holder is in possession of any information furnished by the Corporation that constitutes, or may constitute, material non-public information.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Forced Conversion Amount" means the sum of (i) 100% of the aggregate Stated Value then outstanding, (ii) accrued but unpaid dividends and (iii) all liquidated damages and other amounts due in respect of the Series A Preferred Stock.

"Forced Conversion Date" shall have the meaning set forth in Section 8(a).

"Forced Conversion Notice" shall have the meaning set forth in Section 8(a).

"Forced Conversion Notice Date" shall have the meaning set forth in Section 8(a).

"Fundamental Transaction" shall have the meaning set forth in Section 7(e).

"Holder" shall have the meaning given such term in Section 2.

"Junior Securities" means the Common Stock and all other Common Stock Equivalents of the Corporation other than those securities which are explicitly senior or pari passu to the Series A Preferred Stock in dividend rights or liquidation preference.

"Liquidation" shall have the meaning set forth in Section 5.

"Notice of Conversion" shall have the meaning set forth in Section 6(a).

"Optional Redemption" shall have the meaning set forth in Section 8(b).

"Optional Redemption Amount" means the sum of (i) 100% of the aggregate Stated Value then outstanding, (ii) accrued but unpaid dividends and (iii) all liquidated damages and other amounts due in respect of the Series A Preferred Stock.

"Optional Redemption Date" shall have the meaning set forth in Section 8(b).

"Optional Redemption Notice" shall have the meaning set forth in Section 8(b).

"Optional Redemption Notice Date" shall have the meaning set forth in Section 8(b).

"Original Issue Date" means the date of the first issuance of any shares of the Series A Preferred Stock regardless of the number of transfers of any particular shares of

4

Series A Preferred Stock and regardless of the number of certificates which may be issued to evidence such Series A Preferred Stock.

"Purchase Agreement" means the Securities Purchase Agreement, dated as of the Original Issue Date, to which the Corporation and the original Holders are parties, as amended, modified or supplemented from time to time in accordance with its terms.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Series A Preferred Stock" shall have the meaning set forth in Section 2.

"Share Delivery Date" shall have the meaning set forth in Section 6(e).

"Stated Value" shall have the meaning set forth in Section 2, as the same may be increased pursuant to Section 3.

"Subscription Amount" means, as to each Purchaser, the amount in United States dollars and in immediately available funds to be paid for the Series A Preferred Stock purchased pursuant to the Purchase Agreement as specified below such Purchaser's name on the signature page of the Purchase Agreement and next to the heading "Subscription Amount."

"Subsidiary" shall have the meaning set forth in the Purchase Agreement.

"Threshold Period" shall have the meaning set forth in Section 8(a).

"Trading Day" means a day on which the principal Trading Market is open for business.

"Trading Market" means the following exchanges on which the Common Stock is listed for trading on the date in question: the Nasdaq Capital Market or the Nasdaq Global Market.

"Transaction Documents" shall have the meaning set forth in the Purchase Agreement.

"Triggering Event" shall have the meaning set forth in Section 9(a).

"Triggering Redemption Amount" means, for each share of Series A Preferred Stock, the sum of (i) the greater of (A) 130% of the Stated Value and (B) the product of (a) the VWAP on the Trading Day immediately preceding the date of the Triggering Event and (b) the Stated Value divided by the then Conversion Price, (ii) all accrued but unpaid dividends thereon and (iii) all liquidated damages and other costs, expenses or amounts due in respect of the Series A Preferred Stock.

5

"Triggering Redemption Payment Date" shall have the meaning set forth in Section 9(b).

"VWAP" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted for trading as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time)); (b) if the OTC Bulletin Board is not a Trading Market, the volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the OTC Bulletin Board; (c) if the Common Stock is not then quoted for trading on the OTC Bulletin Board and if prices for the Common Stock are then reported in the "Pink Sheets" published by Pink Sheets, LLC (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported; or (d) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders and reasonably acceptable to the Corporation, the fees and expenses of which shall be paid by the Corporation.

Section 2.     Designation, Amount and Par Value. The series of preferred stock shall be designated as its Series A 3% Convertible Preferred Stock (the "Series A Preferred Stock") and the number of shares so designated shall be up to 20,000 (which shall not be subject to increase without the written consent of all of the holders of the Series A Preferred Stock (each, a "Holder" and collectively, the "Holders")). Each share of Series A Preferred Stock shall have no par value per share and a stated value equal to $1,000, subject to increase set forth in Section 3(a) below (the "Stated Value").

Section 3.     Dividends.

a)     Dividends. Holders shall be entitled to receive, and the Corporation shall pay, cumulative dividends at the rate per share (as a percentage of the Stated Value) of 3% per annum (subject to increase pursuant to Section 9(b) of this Article II.2(b)), payable quarterly on January 1, April 1, July 1 and October 1, beginning on the first such date after the Original Issue Date, on each Conversion Date (with respect only to shares of Series A Preferred Stock being converted) and on each Optional Redemption Date (with respect only to Series A Preferred Stock being redeemed) (each such date, a "Dividend Payment Date") (if any Dividend Payment Date is not a Trading Day, the applicable payment shall be due on the next succeeding Trading Day) in cash; provided, however, that if funds are not legally available for the payment of dividends on the Series A Preferred Stock, such dividends shall accrete to, and increase, the Stated Value. Dividends on the Series A Preferred Stock shall be calculated on the basis of a 360-day year, consisting of twelve 30-day periods, shall accrue daily commencing on the Original Issue Date, and shall be deemed to accrue from such Original Issue Date whether or not earned or declared and whether or not there are profits, surplus or other funds of the

6

Corporation legally available for the payment of dividends. Any dividends that are not paid within three Trading Days following a Dividend Payment Date shall continue to accrue and shall entail a late fee, payable in cash, at the rate of 18% per annum or the lesser rate permitted by applicable law (such late fee shall accrue daily from the Dividend Payment Date through and including the date of payment).

b)     So long as any Series A Preferred Stock shall remain outstanding, neither the Corporation nor any Subsidiary thereof shall redeem, purchase or otherwise acquire directly or indirectly any Junior Securities except as expressly permitted by Section 9(a)(v). So long as any Series A Preferred Stock shall remain outstanding, neither the Corporation nor any Subsidiary thereof shall directly or indirectly pay or declare any dividend or make any distribution upon (other than a dividend or distribution described in Section 6 of this Article II.2(b)) or dividends due and paid in the ordinary course on preferred stock of the Corporation at such times when the Corporation is in compliance with its payment and other obligations hereunder), nor shall any distribution be made in respect of, any Junior Securities as long as any dividends due on the Series A Preferred Stock remain unpaid, nor shall any monies be set aside for or applied to the purchase or redemption (through a sinking fund or otherwise) of any Junior Securities or shares pari passu with the Series A Preferred Stock.

Section 4.     Voting.

a)     Voting Rights.    Except as otherwise provided herein or as otherwise required by law, each holder of the shares of Series A Preferred Stock shall have the right to the number of votes equal to the number of Conversion Shares then issuable upon conversion of the Series A Preferred Stock held by such Holder in all matters as to which shareholders are required or permitted to vote, and with respect to such vote, such Holder shall have full voting rights and powers equal to the voting rights and powers of the holders of Common Stock, and shall be entitled, notwithstanding any provision in these Articles as amended hereby, to vote, together with the holders of Common Stock as a single class, with respect to any question upon which holders of Common Stock have the right to vote; provided, however, as to any Holder the right to vote such shares shall be limited to the number of shares issuable to such Holder pursuant to Section 6(c) on the record date for such vote. To the extent permitted under RCW Chapter 23B, and in accordance with Article V.1 of these Articles, the Corporation's shareholders may take action by the affirmative vote of a majority of all shareholders of this Corporation entitled to vote on an action. This Section is specifically intended to reduce the voting requirements otherwise prescribed under RCW 23B.010.030, 23B.11.030, 23B.11.035 and 23B.12.020 in accordance with RCW 23B.07.270. Without limiting the generality of the foregoing, and notwithstanding the provisions of RCW 23B.10.040, subsections 1(a),(e) and (f), but subject to the provisons of the Section 4(b) below, the Corporation may take any of the actions described in RCW 23B.10.040, subsections 1(a), (e) and (f) by the affirmative vote of the holders of a majority of the Series A Preferred Stock and the Common Stock, voting together as one class, with each holder of Series A Preferred Stock having the number of votes set forth above.

7

b)    Restrictions on Corporate Action.  Notwithstanding anything to the contrary in Section 4(a) above, as long as any shares of Series A Preferred Stock are outstanding, the Corporation shall not, without the affirmative vote of the Holders of a majority of the then outstanding shares of the Series A Preferred Stock, (a) alter or change adversely the powers, preferences or rights given to the Series A Preferred Stock or alter or amend this Article II.2(b), (b) authorize or create any class of stock ranking as to dividends, redemption or distribution of assets upon a Liquidation (as defined in Section 5 of this Article II.2(b)) senior to or otherwise pari passu with the Series A Preferred Stock, (c) amend its articles of incorporation or other charter documents in any manner that adversely affects any rights of the Holders, (d) increase the number of authorized shares of Series A Preferred Stock, or (e) enter into any agreement with respect to any of the foregoing.

Section 5.    Liquidation.  Upon any liquidation, dissolution or winding-up of the Corporation, whether voluntary or involuntary (a "Liquidation"), the Holders shall be entitled to receive out of the assets, whether capital or surplus, of the Corporation an amount equal to the Stated Value, plus any accrued and unpaid dividends thereon and any other fees or liquidated damages owing thereon, for each share of Series A Preferred Stock before any distribution or payment shall be made to the holders of any Junior Securities, and if the assets of the Corporation shall be insufficient to pay in full such amounts, then the entire assets to be distributed to the Holders shall be ratably distributed among the Holders in accordance with the respective amounts that would be payable on such shares if all amounts payable thereon were paid in full. A Fundamental Transaction or Change of Control Transaction shall not be deemed a Liquidation. The Corporation shall mail written notice of any such Liquidation, not less than 45 days prior to the payment date stated therein, to each Holder.

Section 6.    Conversion.

a)    Conversions at Option of Holder. Each share of Series A Preferred Stock shall be convertible, at any time and from time to time from and after the Original Issue Date at the option of the Holder thereof, into that number of shares of Common Stock (subject to the limitations set forth in Section 6(c)) determined by dividing the Stated Value of such share of Series A Preferred Stock by the Conversion Price. Holders shall effect conversions by providing the Corporation with the form of conversion notice attached hereto as Annex A (a "Notice of Conversion"). Each Notice of Conversion shall specify the number of shares of Series A Preferred Stock to be converted, the number of shares of Series A Preferred Stock owned prior to the conversion at issue, the number of shares of Series A Preferred Stock owned subsequent to the conversion at issue and the date on which such conversion is to be effected, which date may not be prior to the date the applicable Holder delivers by facsimile such Notice of Conversion to the Corporation (such date, the "Conversion Date"). If no Conversion Date is specified in a Notice of Conversion, the Conversion Date shall be the date that such Notice of Conversion to the Corporation is deemed delivered hereunder. The calculations and entries set forth in the Notice of Conversion shall control in the absence of manifest or mathematical error. To

8

effect conversions of shares of Series A Preferred Stock, a Holder shall not be required to surrender the certificate(s) representing such shares of Series A Preferred Stock to the Corporation unless all of the shares of Series A Preferred Stock represented thereby are so converted, in which case such Holder shall deliver the certificate representing such shares of Series A Preferred Stock promptly following the Conversion Date at issue. Shares of Series A Preferred Stock converted into Common Stock or redeemed in accordance with the terms hereof shall be canceled and shall not be reissued.

b)      Conversion Price. The conversion price for the Series A Preferred Stock shall equal $1.6725 subject to adjustment herein (the "Conversion Price").

c)      Beneficial Ownership Limitation. The Corporation shall not effect any conversion of the Series A Preferred Stock, and a Holder shall not have the right to convert any portion of the Series A Preferred Stock, to the extent that, after giving effect to the conversion set forth on the applicable Notice of Conversion, such Holder (together with such Holder's Affiliates, and any other person or entity acting as a group together with such Holder or any of such Holder's Affiliates) would beneficially own in excess of the Beneficial Ownership Limitation (as defined below). For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by such Holder and its Affiliates shall include the number of shares of Common Stock issuable upon conversion of the Series A Preferred Stock with respect to which such determination is being made, but shall exclude the number of shares of Common Stock which are issuable upon (A) conversion of the remaining, unconverted Stated Value of Series A Preferred Stock beneficially owned by such Holder or any of its Affiliates and (B) exercise or conversion of the unexercised or unconverted portion of any other securities of the Corporation subject to a limitation on conversion or exercise analogous to the limitation contained herein (including the Warrants) beneficially owned by such Holder or any of its Affiliates. Except as set forth in the preceding sentence, for purposes of this Section 6(c), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. To the extent that the limitation contained in this Section 6(c) applies, the determination of whether the Series A Preferred Stock is convertible (in relation to other securities owned by such Holder together with any Affiliates) and of how many shares of Series A Preferred Stock are convertible shall be in the sole discretion of such Holder, and the submission of a Notice of Conversion shall be deemed to be such Holder's determination of whether the shares of Series A Preferred Stock may be converted (in relation to other securities owned by such Holder together with any Affiliates) and how many shares of the Series A Preferred Stock are convertible, in each case subject to such aggregate percentage limitations. To ensure compliance with this restriction, each Holder will be deemed to represent to the Corporation each time it delivers a Notice of Conversion that such Notice of Conversion has not violated the restrictions set forth in this paragraph and the Corporation shall have no obligation to verify or confirm the accuracy of such determination. In addition, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder.   For purposes of this Section 6(c), in

9

determining the number of outstanding shares of Common Stock, a Holder may rely on the number of outstanding shares of Common Stock as stated in the most recent of the following: (A) the Corporation's most recent Form 10-Q or Form 10-K, as the case may be, (B) a more recent public announcement by the Corporation or (C) a more recent notice by the Corporation or the Corporation's transfer agent setting forth the number of shares of Common Stock outstanding. Upon the written or oral request of a Holder, the Corporation shall within two Trading Days confirm orally and in writing to such Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Corporation, including the Series A Preferred Stock, by such Holder or its Affiliates since the date as of which such number of outstanding shares of Common Stock was reported. The "Beneficial Ownership Limitation" shall be 4.99% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock issuable upon conversion of Series A Preferred Stock held by the applicable Holder. The Beneficial Ownership Limitation provisions of this Section 6(c) may be waived by such Holder, at the election of such Holder, upon not less than 61 days' prior notice to the Corporation, to change the Beneficial Ownership Limitation to 9.99% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon conversion of Series A Preferred Stock held by the applicable Holder and the provisions of this Section 6(c) shall continue to apply. Upon such a change by a Holder of the Beneficial Ownership Limitation from such 4.99% limitation to such 9.99% limitation, the Beneficial Ownership Limitation shall not be further waived by such Holder. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 6(c) to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Beneficial Ownership Limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitations contained in this paragraph shall apply to a successor holder of Series A Preferred Stock. Notwithstanding anything herein to the contrary, this provision shall not apply to any Holder that has elected to waive this provision (A) on its signature page to the Purchase Agreement or (B) in a writing acceptable to the Company.

d)    Mechanics of Conversion

i.    Delivery of Certificate Upon Conversion. Not later than five Trading Days after each Conversion Date (the "Share Delivery Date"), the Corporation shall deliver, or cause to be delivered, to the converting Holder (A) a certificate or certificates, which shall be free of restrictive legends and trading restrictions, representing the number of shares of Common Stock being acquired upon the conversion of shares of Series A Preferred Stock and (B) a bank check in the amount of accrued and unpaid dividends. The Corporation shall use its best efforts to deliver any certificate or certificates required to be delivered by the Corporation under this Section 6 electronically through the Depository Trust Company or another established clearing corporation performing similar

functions. If, in the case of any Notice of Conversion, such certificate or certificates are not delivered to or as directed by the applicable Holder by the seventh Trading Day after the Conversion Date, the applicable Holder shall be entitled to elect to rescind such Conversion Notice by written notice to the Corporation at any time on or before its receipt of such certificate or certificates, in which event the Corporation shall promptly return to such Holder any original Series A Preferred Stock certificate delivered to the Corporation and such Holder shall promptly return any Common Stock certificates representing the shares of Series A Preferred Stock tendered for conversion to the Corporation.

     ii.     Obligation Absolute; Partial Liquidated Damages. The Corporation's obligation to issue and deliver the Conversion Shares upon conversion of Series A Preferred Stock in accordance with the terms hereof are absolute and unconditional, irrespective of any action or inaction by a Holder to enforce the same, any waiver or consent with respect to any provision hereof, the recovery of any judgment against any Person or any action to enforce the same, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by such Holder or any other Person of any obligation to the Corporation or any violation or alleged violation of law by such Holder or any other person, and irrespective of any other circumstance which might otherwise limit such obligation of the Corporation to such Holder in connection with the issuance of such Conversion Shares; provided, however, that such delivery shall not operate as a waiver by the Corporation of any such action that the Corporation may have against such Holder. In the event a Holder shall elect to convert any or all of the Stated Value of its Series A Preferred Stock, the Corporation may not refuse conversion based on any claim that such Holder or any one associated or affiliated with such Holder has been engaged in any violation of law, agreement or for any other reason, unless an injunction from a court, on notice to Holder, restraining and/or enjoining conversion of all or part of the Series A Preferred Stock of such Holder shall have been sought and obtained. In the absence of such injunction, the Corporation shall issue Conversion Shares and, if applicable, cash, upon a properly noticed conversion. If the Corporation fails to deliver to a Holder such certificate or certificates pursuant to Section 6(c)(i) on the second Trading Day after the Share Delivery Date applicable to such conversion, the Corporation shall pay to such Holder, in cash, as liquidated damages and not as a penalty, for each $10,000 of Stated Value of Series A Preferred Stock being converted, $50 per Trading Day for each Trading Day after such second Trading Day after the Share Delivery Date until such certificates are delivered. Nothing herein shall limit a Holder's right to pursue actual damages or declare a Triggering Event pursuant to Section 9 for the Corporation's failure to deliver Conversion Shares within the period specified herein and such Holder shall have the right to pursue all remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief. The Exercise of any such rights shall not prohibit a Holder from seeking to enforce damages pursuant to any other Section hereof or under applicable law.

11

iii.    Compensation for Buy-In on Failure to Timely Deliver Certificates Upon Conversion. If the Corporation fails to deliver to a Holder the applicable certificate or certificates by the second Trading Day following the Share Delivery Date pursuant to Section 6(e)(i), and if after such date such Holder is required by its brokerage firm to purchase (in an open market transaction or otherwise), or the Holder's brokerage firm purchases, shares of Common Stock to deliver in satisfaction of a sale by such Holder of the Conversion Shares which such Holder was entitled to receive upon the conversion relating to such Share Delivery Date (a "Buy-In"), then the Corporation shall (A) pay in cash to such Holder (in addition to any other remedies available to or elected by such Holder) the amount by which (x) such Holder's total purchase price (including any brokerage commissions) for the shares of Common Stock so purchased exceeds (y) the product of (1) the aggregate number of shares of Common Stock that such Holder was entitled to receive from the conversion at issue multiplied by (2) the actual sale price at which the sell order giving rise to such purchase obligation was executed (including any brokerage commissions) and (B) at the option of such Holder, either reissue (if surrendered) the shares of Series A Preferred Stock equal to the number of shares of Series A Preferred Stock submitted for conversion or deliver to such Holder the number of shares of Common Stock that would have been issued if the Corporation had timely complied with its delivery requirements under Section 6(e)(i). For example, if a Holder purchases shares of Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted conversion of shares of Series A Preferred Stock with respect to which the actual sale price (including any brokerage commissions) giving rise to such purchase obligation was a total of $10,000 under clause (A) of the immediately preceding sentence, the Corporation shall be required to pay such Holder $1,000. The Holder shall provide the Corporation written notice indicating the amounts payable to such Holder in respect of the Buy-In and, upon request of the Corporation, evidence of the amount of such loss. Nothing herein shall limit a Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Corporation's failure to timely deliver certificates representing shares of Common Stock upon conversion of the shares of Series A Preferred Stock as required pursuant to the terms hereof.

iv.    Reservation of Shares Issuable Upon Conversion. The Corporation covenants that it will at all times reserve and keep available out of its authorized and unissued shares of Common Stock for the sole purpose of issuance upon conversion of the Series A Preferred Stock and payment of dividends on the Series A Preferred Stock, each as herein provided, free from preemptive rights or any other actual contingent purchase rights of Persons other than the Holders of the Series A Preferred Stock, not less than such aggregate number of shares of the Common Stock as shall (subject to the terms and conditions in the Purchase Agreement) be issuable (taking into account the adjustments and restrictions of

12

Section 7) upon the conversion of all outstanding shares of Series A Preferred Stock and payment of dividends hereunder. The Corporation covenants that all shares of Common Stock that shall be so issuable shall, upon issue, be duly authorized, validly issued, fully paid and nonassessable and, if the Conversion Shares Registration Statement is then effective under the Securities Act, shall be registered for public sale in accordance with such Conversion Shares Registration Statement.

v.    Fractional Shares. Upon a conversion hereunder, the Corporation shall not be required to issue stock certificates representing fractions of shares of Common Stock, but may if otherwise permitted, make a cash payment in respect of any final fraction of a share based on the VWAP at such time.

vi.    Transfer Taxes. The issuance of certificates for shares of the Common Stock on conversion of this Series A Preferred Stock shall be made without charge to any Holder for any documentary stamp or similar taxes that may be payable in respect of the issue or delivery of such certificates, provided that the Corporation shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate upon conversion in a name other than that of the Holders of such shares of Series A Preferred Stock so converted and the Corporation shall not be required to issue or deliver such certificates unless or until the Person or Persons requesting the issuance thereof shall have paid to the Corporation the amount of such tax or shall have established to the satisfaction of the Corporation that such tax has been paid.

Section 7.    Certain Adjustments.

a)    Stock Dividends and Stock Splits. If the Corporation, at any time while this Series A Preferred Stock is outstanding: (A) pays a stock dividend or otherwise makes a distribution or distributions payable in shares of Common Stock on shares of Common Stock or any other Common Stock Equivalents (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Corporation upon conversion of, or payment of a dividend on, this Series A Preferred Stock); (B) subdivides outstanding shares of Common Stock into a larger number of shares; (C) combines (including by way of a reverse stock split) outstanding shares of Common Stock into a smaller number of shares; or (D) issues, in the event of a reclassification of shares of the Common Stock, any shares of capital stock of the Corporation, then the Conversion Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding any treasury shares of the Corporation) outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event. Any adjustment made pursuant to this Section 7(a) shall become effective immediately after the record date for the determination of shareholders entitled to receive such dividend or

13

distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

b)    [RESERVED].

c)    Subsequent Rights Offerings. If the Corporation, at any time while this Series A Preferred Stock is outstanding, shall issue rights, options or warrants to all holders of Common Stock (and not to Holders) entitling them to subscribe for or purchase shares of Common Stock at a price per share that is lower than the VWAP on the record date referenced below, then the Conversion Price shall be multiplied by a fraction of which the denominator shall be the number of shares of the Common Stock outstanding on the date of issuance of such rights or warrants plus the number of additional shares of Common Stock offered for subscription or purchase, and of which the numerator shall be the number of shares of the Common Stock outstanding on the date of issuance of such rights or warrants plus the number of shares which the aggregate offering price of the total number of shares so offered (assuming delivery to the Corporation in full of all consideration payable upon exercise of such rights, options or warrants) would purchase at such VWAP. Such adjustment shall be made whenever such rights or warrants are issued, and shall become effective immediately after the record date for the determination of shareholders entitled to receive such rights, options or warrants.

d)    Pro Rata Distributions. If the Corporation, at any time while this Series A Preferred Stock is outstanding, distributes to all holders of Common Stock (and not to Holders) evidences of its indebtedness or assets (including cash and cash dividends) or rights or warrants to subscribe for or purchase any security (other than Common Stock, which shall be subject to Section 7(b)), then in each such case the Conversion Price shall be adjusted by multiplying such Conversion Price in effect immediately prior to the record date fixed for determination of shareholders entitled to receive such distribution by a fraction of which the denominator shall be the VWAP determined as of the record date mentioned above, and of which the numerator shall be such VWAP on such record date less the then fair market value at such record date of the portion of such assets, evidence of indebtedness or rights or warrants so distributed applicable to one outstanding share of the Common Stock as determined by the Board of Directors of the Corporation in good faith. In either case the adjustments shall be described in a statement delivered to the Holders describing the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one share of Common Stock. Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

e)    Fundamental Transaction. If, at any time while this Series A Preferred Stock is outstanding, (A) the Corporation effects any merger or consolidation of the Corporation with or into another Person, (B) the Corporation effects any sale of all or substantially all of its assets in one transaction or a series of related transactions, (C) any tender offer or exchange offer (whether by the Corporation or another Person) is completed pursuant to which holders of Common Stock are permitted to tender or

14

exchange their shares for other securities, cash or property, or (D) the Corporation effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "Fundamental Transaction"), then, upon any subsequent conversion of this Series A Preferred Stock, the Holders shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one share of Common Stock (the "Alternate Consideration"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Corporation shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holders shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Series A Preferred Stock following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to the Corporation or surviving entity in such Fundamental Transaction shall articles of incorporation or an amendment to its articles of incorporation with the same terms and conditions and issue to the Holders new preferred stock consistent with the foregoing provisions and evidencing the Holders' right to convert such preferred stock into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 7(e) and insuring that this Series A Preferred Stock (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

f)     Calculations. All calculations under this Section 7 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be. For purposes of this Section 7, the number of shares of Common Stock deemed to be issued and outstanding as of a given date shall be the sum of the number of shares of Common Stock (excluding any treasury shares of the Corporation) issued and outstanding.

g)     Notice to the Holders.

i.     Adjustment to Conversion Price. Whenever the Conversion Price is adjusted pursuant to any provision of this Section 7, the Corporation shall promptly mail to each Holder a notice setting forth the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment. If the Company enters into a Variable Rate Transaction, despite the prohibition set forth in the Purchase Agreement, the Company shall be deemed to

15

have issued Common Stock or Common Stock Equivalents at the lowest possible conversion price at which such securities may be converted or exercised.

ii.    Notice to Allow Conversion by Holder. If (A) the Corporation shall declare a dividend (or any other distribution in whatever form) on the Common Stock, (B) the Corporation shall declare a special nonrecurring cash dividend on or a redemption of the Common Stock, (C) the Corporation shall authorize the granting to all holders of the Common Stock of rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights, (D) the approval of any shareholders of the Corporation shall be required in connection with any reclassification of the Common Stock, any consolidation or merger to which the Corporation is a party, any sale or transfer of all or substantially all of the assets of the Corporation, of any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property or (E) the Corporation shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Corporation, then, in each case, the Corporation shall cause to be filed at each office or agency maintained for the purpose of conversion of this Series A Preferred Stock, and shall cause to be delivered to each Holder at its last address as it shall appear upon the stock books of the Corporation, at least 20 calendar days prior to the applicable record or effective date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of the Common Stock for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange, provided that the failure to deliver such notice or any defect therein or in the delivery thereof shall not affect the validity of the corporate action required to be specified in such notice. The Holder is entitled to convert the Stated Value of its Series A Preferred Stock (or any part hereof) during the 20-day period commencing on the date of such notice through the effective date of the event triggering such notice.

Section 8.    Forced Conversion and Optional Redemption.

a)    Forced Conversion. Notwithstanding anything herein to the contrary, if after the six month anniversary of the Original Issue Date the VWAP for each of any 20 consecutive Trading Day period ("Threshold Period") exceeds $3.345, subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the Original Issue Date, the Corporation may, within 1 Trading Day after the end of any such Threshold Period,

16

deliver a written notice to all Holders (a "Forced Conversion Notice" and the date such notice is delivered to all Holders, the "Forced Conversion Notice Date") to cause each Holder to convert all or part of such Holder's Series A Preferred Stock (as specified in such Forced Conversion Notice) plus all accrued but unpaid dividends thereon and all liquidated damages and other amounts due in respect of the Series A Preferred Stock pursuant to Section 6, with the "Conversion Date" for purposes of Section 6 deemed to occur on the third Trading Day following the Forced Conversion Notice Date (such third Trading Day, the "Forced Conversion Date"). The Corporation may not deliver a Forced Conversion Notice, and any Forced Conversion Notice delivered by the Corporation shall not be effective, unless all of the Equity Conditions have been met on each Trading Day during the applicable Threshold Period through and including the later of the Forced Conversion Date and the Trading Day after the date that the Conversion Shares issuable pursuant to such forced conversion are actually delivered to the Holders pursuant to the Forced Conversion Notice. Any Forced Conversion Notices shall be applied ratably to all of the Holders based on each Holder's initial purchases of Series A Preferred Stock hereunder, provided that any voluntary conversions by a Holder shall be applied against such Holder's pro rata allocation, thereby decreasing the aggregate amount forcibly converted hereunder if less than all shares of the Series A Preferred Stock are forcibly converted. For purposes of clarification, a Forced Conversion shall be subject to all of the provisions of Section 6, including, without limitation, the provisions requiring payment of liquidated damages and limitations on conversions.

b)    Optional Redemption at Election of Holder. Subject to the provisions of this Section 8, at any time after the two year anniversary of the Original Issue Date, the Holder may deliver a notice to the Corporation (an "Optional Redemption Notice" and the date such notice is deemed delivered hereunder, the "Optional Redemption Notice Date") requiring the Corporation to redeem some or all of the then outstanding Series A Preferred Stock for cash in an amount equal to the Optional Redemption Amount on the fifth Trading Day following the Optional Redemption Notice Date (such date, the "Optional Redemption Date" and such redemption, the "Optional Redemption"). The Optional Redemption Amount is payable in full on the Optional Redemption Date. If the Corporation fails to pay the Optional Redemption Amount in full on the Optional Redemption Amount on the Optional Redemption Date, the Corporation shall pay interest thereon at a rate equal to the lesser of 18% per annum or the maximum rate permitted by applicable law, accruing daily from the first day following the Optional Redemption Date until such Optional Redemption Amount, plus any interest thereon, is paid in full. The Corporation shall honor all Notices of Conversion tendered from the time of delivery of the Optional Redemption Notice through the date the Optional Redemption Amount is paid in full.

Section 9.    Redemption Upon Triggering Events.

a)    "Triggering Event" means any one or more of the following events (whatever the reason and whether it shall be voluntary or involuntary or effected by

17

operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

      i.      if the Company fails to provide at all times an effective registration statement that permits the Company to issue the Conversion Shares or which allows the Holder to sell the Conversion Shares pursuant thereto, subject to a grace period of 20 calendar days;

      ii.      the Corporation shall fail to deliver certificates representing Conversion Shares issuable upon a conversion hereunder that comply with the provisions hereof prior to the fifth Trading Day after such certificates are required to be delivered hereunder, or the Corporation shall provide written notice to any Holder, including by way of public announcement, at any time, of its intention not to comply with requests for conversion of any shares of Series A Preferred Stock in accordance with the terms hereof;

      iii.      the Corporation shall fail to have available a sufficient number of authorized and unreserved shares of Common Stock to issue to such Holder upon a conversion hereunder;

      iv.      unless specifically addressed elsewhere in this these articles of incorporation as a Triggering Event, the Corporation shall fail to observe or perform any other covenant, agreement or warranty contained in, or otherwise commit any breach of the Transaction Documents, and such failure or breach shall not, if subject to the possibility of a cure by the Corporation, have been cured within 30 calendar days after the date on which written notice of such failure or breach shall have been delivered;

      v.      the Corporation shall be party to a Change of Control Transaction;

      vi.      there shall have occurred a Bankruptcy Event;

      vii.      the Common Stock shall fail to be listed or quoted for trading on a Trading Market for more than five Trading Days, which need not be consecutive Trading Days; or

      viii.      any monetary judgment, writ or similar final process shall be entered or filed against the Corporation, any Subsidiary or any of their respective property or other assets for greater than $50,000, and such judgment, writ or similar final process shall remain unvacated, unbonded or unstayed for a period of 45 calendar days.

      b)      Upon the occurrence of a Triggering Event, each Holder shall (in addition to all other rights it may have hereunder or under applicable law) have the right, exercisable at the sole option of such Holder, to require the Corporation to redeem all of

the Series A Preferred Stock then held by such Holder for a redemption price, in shares of Common Stock, equal to the Triggering Redemption Amount. The Triggering Redemption Amount shall be due and payable within five Trading Days of the date on which the notice for the payment therefor is provided by a Holder (the "Triggering Redemption Payment Date"). If the Corporation fails to pay in full the Triggering Redemption Amount hereunder on the date such amount is due in accordance with this Section, the Corporation will pay interest thereon at a rate equal to the lesser of 18% per annum or the maximum rate permitted by applicable law, accruing daily from such date until the Triggering Redemption Amount, plus all such interest thereon, is paid in full. For purposes of this Section, a share of Series A Preferred Stock is outstanding until such date as the applicable Holder has been paid the Triggering Redemption Amount in cash.

Section 10. Negative Covenants. So long as any shares of Series A Preferred Stock are outstanding, unless the holders of at least 67% in Stated Value of the then outstanding shares of Series A Preferred Stock shall have otherwise given prior written consent, the Corporation shall not, and shall not permit any of its subsidiaries (whether or not a Subsidiary on the Original Issue Date) to, directly or indirectly:

a) amend these articles of incorporation, its bylaws or other charter documents so as to materially and adversely affect any rights of any Holder;

b) repay, repurchase or offer to repay, repurchase or otherwise acquire any shares of its Common Stock, Common Stock Equivalents or Junior Securities, except for the Conversion Shares to the extent permitted or required under the Transaction Documents or as otherwise permitted by the Transaction Documents; provided, however, that this restriction shall not apply to the repurchase of up to 1,000,000 shares of Common Stock in any 12 month period (subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the Original Issue Date) from employees, officers, directors, consultants or other persons performing services for this Corporation or any Subsidiary pursuant to agreements approved by a majority of the Board of Directors or under which this Corporation has the option to repurchase such shares at cost or at cost upon the occurrence of certain events, such a termination of employment.

c) pay cash dividends or distributions on Junior Securities of the Corporation; or

d) enter into any agreement or understanding with respect to any of the foregoing.

Section 11. Miscellaneous.

a) Notices. Any and all notices or other communications or deliveries to be provided by the Holders hereunder including, without limitation, any Notice of Conversion, shall be in writing and delivered personally, by facsimile, or sent by a

19

nationally recognized overnight courier service, addressed to the Corporation, at the address set forth above, facsimile number (206) 272-4302, Attention: President or such other facsimile number or address as the Corporation may specify for such purposes by notice to the Holders delivered in accordance with this Section 11. Any and all notices or other communications or deliveries to be provided by the Corporation hereunder shall be in writing and delivered personally, by facsimile, or sent by a nationally recognized overnight courier service addressed to each Holder at the facsimile number or address of such Holder appearing on the books of the Corporation, or if no such facsimile number or address appears on the books of the Corporation, at the principal place of business of the Holders. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number specified in this Section 11 prior to 5:30 p.m. (New York City time) on any date, (ii) the date immediately following the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number specified in this Section 11 between 5:30 p.m. and 11:59 p.m. (New York City time) on any date, (iii) the second Business Day following the date of mailing, if sent by nationally recognized overnight courier service, or (iv) upon actual receipt by the party to whom such notice is required to be given.

b)      Absolute Obligation. Except as expressly provided herein, no provision of this Certificate of Designation shall alter or impair the obligation of the Corporation, which is absolute and unconditional, to pay liquidated damages, accrued dividends and accrued interest, as applicable, on the shares of Series A Preferred Stock at the time, place, and rate, and in the coin or currency, herein prescribed.

c)      Lost or Mutilated Series A Preferred Stock Certificate. If a Holder's Series A Preferred Stock certificate shall be mutilated, lost, stolen or destroyed, the Corporation shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated certificate, or in lieu of or in substitution for a lost, stolen or destroyed certificate, a new certificate for the shares of Series A Preferred Stock so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such certificate, and of the ownership hereof reasonably satisfactory to the Corporation.

d)      Governing Law. All questions concerning the construction, validity, enforcement and interpretation of this Certificate of Designation shall be governed by and construed and enforced in accordance with the internal laws of the State of Washington, without regard to the principles of conflict of laws thereof.

e)      Waiver. Any waiver by the Corporation or a Holder of a breach of any provision of this Certificate of Designation shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Certificate of Designation or a waiver by any other Holders. The failure of the Corporation or a Holder to insist upon strict adherence to any term of this Certificate of Designation on one or more occasions shall not be considered a waiver or deprive that

20

party (or any other Holder) of the right thereafter to insist upon strict adherence to that term or any other term of this Certificate of Designation. Any waiver by the Corporation or a Holder must be in writing.

f)      Severability.  If any provision of this Article II.2(b) is invalid, illegal or unenforceable, the balance of this Article II.2(b) shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances.  If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law.

g)      Next Business Day.  Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

h)      Headings.  The headings contained herein are for convenience only, do not constitute a part of this Article II.2(b) and shall not be deemed to limit or affect any of the provisions hereof.

i)      Status of Converted or Redeemed Series A Preferred Stock.  Shares of Series A Preferred Stock may only be issued pursuant to the Purchase Agreement.  If any shares of Series A Preferred Stock shall be converted, redeemed or reacquired by the Corporation, such shares shall resume the status of authorized but unissued shares of preferred stock and shall no longer be designated as Series A 3% Convertible Preferred Stock.

******************

## ANNEX A

### NOTICE OF CONVERSION

**(TO BE EXECUTED BY THE REGISTERED HOLDER IN ORDER TO CONVERT SHARES OF SERIES A PREFERRED STOCK)**

The undersigned hereby elects to convert the number of shares of Series A 3% Convertible Preferred Stock indicated below into shares of common stock, no par value per share (the "Common Stock"), of Cell Therapeutics, Inc., a Washington corporation (the "Corporation"), according to the conditions hereof, as of the date written below. If shares of Common Stock are to be issued in the name of a Person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto and is delivering herewith such certificates and opinions as may be required by the Corporation in accordance with the Purchase Agreement. No fee will be charged to the Holders for any conversion, except for any such transfer taxes.

Conversion calculations:

Date to Effect Conversion: _____

Number of shares of Preferred Stock owned prior to Conversion: _____

Number of shares of Preferred Stock to be Converted: _____

Stated Value of shares of Preferred Stock to be Converted: _____

Number of shares of Common Stock to be Issued: _____

Applicable Conversion Price: _____

Number of shares of Preferred Stock subsequent to Conversion: _____

[HOLDER]

By:_____
    Name:
    Title:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

22

( . ' .t   .

I certify that I am a duly appointed and incumbent officer of the above named Corporation and that I am authorized to execute these Articles of Amendment on behalf of the Corporation.

EXECUTED, this  8th  day of February, 2007.

CELL THERAPEUTICS, INC.,
a Washington corporation

Name: James A. Bianco, M.D.
Title: President and Chief Executive Officer

# EXHIBIT C



EDGAR°pro

# CELL THERAPEUTICS INC

## FORM 8-K
(Current report filing)

## Filed 03/05/08 for the Period Ending 03/03/08

| | |
|---|---|
| Address | 501 ELLIOTT AVE W |
| | STE 400 |
| | SEATTLE, WA 98119 |
| Telephone | 2062707100 |
| CIK | 0000891293 |
| Symbol | CTIC |
| SIC Code | 2834 - Pharmaceutical Preparations |
| Industry | Biotechnology & Drugs |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2008, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report: (Date of earliest event reported): March 3, 2008

---

# CELL THERAPEUTICS, INC.
(Exact name of registrant as specified in its charter)

| Washington | 001-12465 | 91-1533912 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification Number) |

501 Elliott Avenue West, Suite 400
Seattle, Washington 98119
(Address of principal executive offices)

Registrant's telephone number, including area code: (206) 282-7100

Not applicable
(Former name or former address, if changed since last report).

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Section 1 – Registrant's Business and Operations**

**Item 1.01.  Entry into a Material Definitive Agreement.**

On March 3, 2008, Cell Therapeutics, Inc. (the "Company") entered into a Securities Purchase Agreement (the "Purchase Agreement") by and among the Company and certain investor signatories thereto (the "Investors"). Pursuant to the Purchase Agreement, the Company agreed to issue to the Investors approximately $51.7 million of the Company's 9% Convertible Senior Notes due 2012 (the "Notes") plus warrants to purchase 7,326,950 shares of common stock, no par value (the "Common Stock") at an exercise price of $1.41 per share (the "Warrants"). The Notes are issued pursuant to an Indenture dated March 3, 2008 between the Company and U.S. Bank National Association as trustee (the "Indenture"), which includes a form of Global Note to be issued to the investors.

Also pursuant to the Agreement, certain existing holders of the Company's Series A 3% Convertible Preferred Stock, Series B 3% Convertible Preferred Stock, Series C 3% Convertible Preferred Stock and Series D 7% Convertible Preferred Stock (the "Preferred Stock") converted their shares of Preferred Stock into common stock in accordance with the respective provisions of the Company's Amended and Restated Articles of Incorporation, induced by an aggregate cash payment of approximately $16.2 million. After satisfaction of the closing conditions and completion of the transaction, approximately $13.1 million of stated value of the Preferred Stock will remain outstanding.

The Notes will bear an annual interest rate of 9% and be convertible into Common Stock initially at a rate of approximately 709.22 shares per $1,000 principal amount of the Notes, which is equivalent to an initial conversion price of approximately $1.41 (the "Conversion Price"). The Conversion Price may be automatically adjusted from time to time upon occurrence of certain events, such as a split or recapitalization of the common stock. Upon conversion of the Notes, the Company shall be required to pay a make-whole amount to the Holders of the Notes so converted equal to $270 per $1,000 principal amount of the converted Notes less any interest paid on such Notes prior to the conversion date (a "Make-Whole Payment"). An amount adequate to pay the Make-Whole Payments on all outstanding Notes shall be held in escrow for a period of one year.

The Notes will automatically convert if, at any time after March 4, 2009 and prior to maturity, the closing price of the Common Stock has exceeded 150% of the Conversion Price then in effect for at least 20 trading days within any 30 consecutive trading day period, subject to certain conditions (a "Triggering Event"). The amount of Notes that shall automatically convert on a Triggering Event shall equal the lesser of (i) the value of ten (10) times the volume weighted average price of the Common Stock during the 20-day period when the stock price exceeded 150% of the Conversion Price, multiplied by the average daily trading volume of the Common Stock during such 20 day period and rounded down to the nearest $1,000, and (ii) one half of the principal amount of the Notes that have been authenticated under the Indenture as of the date of the automatic conversion notice. Once a Triggering Event has occurred, a new 30 trading day period for which an automatic conversion may be triggered shall commence.

In the event of certain changes in control, holders of the Notes may require us to repurchase their Notes at a repurchase price equal to 100% of the aggregate principal amount of such holders' outstanding Notes at the time of such repurchase, together with interest accrued to the repurchase date.

Interest on the Notes is payable, at the option of the Company, in cash, registered Common Stock or some combination thereof, subject to certain conditions. If not converted or repurchased prior to maturity, the Notes mature on March 4, 2012.

An event of default under the Indenture will occur with regard to the Notes if the Company: (i) is delinquent in making certain payments due under the Notes; (ii) fails to deliver certain required notices under the Notes; (iii) fails, following notice, to cure a breach of a covenant under the Indenture; (iv) incurs certain events of default with respect to other indebtedness; (v) fails to pay when due certain indebtedness; or (vi) is subject to certain bankruptcy proceedings or orders. Upon the occurrence of an event of default, the full aggregate principal amount of the Notes, together with interest and other amounts owing, becomes immediately due and payable. Further, the Notes shall accrue interest at 12% per annum if an event of default occurs.

The Notes are senior unsecured obligations of the Corporation and rank *pari passu* in right of payment with all existing and future senior indebtedness of the Corporation, including the Corporation's 6.75% Convertible Senior Notes due 2010, 7.5% Convertible Senior Notes due 2011 and 5.75% Convertible Senior Notes due 2011, and rank senior in right of payment to the Corporation's currently outstanding 5.75% Convertible Senior Subordinated Notes due 2008, 5.75% Convertible Subordinated Notes due 2008 and 4% Convertible Senior Subordinated Notes due 2010. The Corporation has also agreed to certain restrictions on its incurrence of future indebtedness.

The Warrants will not be exercisable for 120 days after the closing date, and will expire on the third anniversary of the date on which they become exercisable. The Warrants will be exercisable, at the option of each holder, upon the surrender of the Warrant to us and payment of the exercise price of the shares of Common Stock being acquired. The Warrants are governed by the terms of a Common Stock Purchase Warrant, to be dated as of the closing date, by and between the Company and each Investor in the form attached hereto as Exhibit 4.2 (the "Form of Warrant").

With the exception of any shares of the Company's common stock issuable upon exercise of the warrants, the Securities are registered under the Securities Act of 1933, as amended, on the Company's previously filed and effective Registration Statement on Form S-3 (File No. 333-143452) (the "Registration Statement"). The Company filed a base prospectus and a prospectus supplement relating to the issuance and sale of the Notes and Warrants (other than the shares underlying the Warrants) with the Securities and Exchange Commission (the "SEC") on March 4, 2008. The shares issuable upon exercise of the Warrants are not currently registered, however the Company has agreed to use its best efforts to register those shares to the extent the shares cannot be sold under Rule 144 of the Securities Act of 1933, as amended (the "Act") without any volume or manner of sale limitations or any requirement that the Company comply with the public information requirement under Rule 144(c) of the Act.

The description of the terms and conditions of the Purchase Agreement, the Indenture and the Form of Warrant set forth herein does not purport to be complete and is qualified in its entirety by reference to the full text of the form of Purchase Agreement, which is attached hereto as Exhibit 10.1 and incorporated herein by reference, by reference to the full text of the Indenture, including the form of Global Note, which is attached hereto as Exhibit 4.1 and incorporated herein by reference, and by reference to the full text of the Form of Warrant, which is attached hereto as Exhibit 4.2 and incorporated herein by reference.

### Section 2 – Financial Information

**Item 2.03.   Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The information provided in Item 1.01 of this Current Report on Form 8-K is incorporated herein by reference.

-2-

### Section 7 – Regulation FD

#### Item 7.01.    Regulation FD Disclosure.

The information provided pursuant to this Item 7.01 shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934 (the "Exchange Act") or incorporated by reference into those filings of the Corporation that provide for the incorporation of all reports and documents filed by the Corporation under the Exchange Act. The information furnished pursuant to this Item 7.01 shall instead be deemed "furnished."

On March 4, 2008 the Corporation issued a press release related to the matters described herein (the "Press Release"). The Press Release is attached hereto as Exhibit 99.1 and is incorporated by reference herein.

### Section 8 – Other Events

#### Item 8.01.    Other Events

In connection with the prospectus supplement filed with the SEC on March 4, 2008, regarding the transaction described above, the Company disclosed the following:

As of December 31, 2007 we had unaudited and estimated cash and cash equivalents, securities available-for-sale and interest receivable of approximately $18.4 million, and total current liabilities of $53.5 million. We currently forecast net cash operating expenses of approximately $77 million in 2008 and beyond.

### Section 9 – Financial Statements and Exhibits

#### Item 9.01.    Financial Statements and Exhibits.

(d) Exhibits.

The following exhibits are attached with this report on Form 8-K:

4.1    Indenture, dated March 3, 2008 between Cell Thempeutics, Inc. and U.S. Bank National Association, as trustee, including Form of Global Note

4.2    Form of Warrant

5.1    Opinion of Heller Ehrman LLP

10.1    Form of Purchase Agreement, dated March 3, 2008 between Cell Therapeutics, Inc. and certain other parties thereto.

12.1    Statement Regarding Computation of Earnings to Fixed Charges

25.1    T-1 Statement of Eligibility

99.1    Press Release dated March 4, 2008

-3-

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CELL THERAPEUTICS, INC.

Date: March 5, 2008

By: /s/ Louis A. Bianco

Louis A. Bianco
Executive Vice President, Finance and Administration

-4-

## EXHIBIT INDEX

| Exhibit Number | |
|---|---|
| 4.1 | Indenture, dated March 3, 2008 between Cell Therapeutics, Inc. and U.S. Bank National Association, as trustee, including Form of Global Note |
| 4.2 | Form of Warrant |
| 5.1 | Opinion of Heller Ehrman LLP |
| 10.1 | Form of Purchase Agreement, dated March 3, 2008 between Cell Therapeutics, Inc. and certain other parties thereto |
| 12.1 | Statement Regarding Computation of Earnings to Fixed Charges |
| 25.1 | T-1 Statement of Eligibility |
| 99.1 | Press Release dated March 4, 2008 |

# EXHIBIT D

EX-5.1 4 dex51.htm OPINION OF HELLER EHRMAN LLP

**EXHIBIT 5.1**

March 3, 2008

Main +1.206.447.0900
Fax +1.206.447.0849

26866.0008

Cell Therapeutics, Inc.
501 Elliott Avenue West, Suite 4000
Seattle, WA 98119

Re:  Registration of Securities of Cell Therapeutics, Inc.

Ladies and Gentlemen:

This opinion is furnished to Cell Therapeutics, Inc., a Washington corporation (the "Company"), in connection with the proposed offer and sale by the Company of up to $51,655,000 in aggregate principal amount of 9 % Convertible Senior Notes due 2012 (the "Convertible Notes") pursuant to the Registration Statement on Form S-3 (File No. 333-143452), filed by the Company with the Securities and Exchange Commission (the "Commission") on June 15, 2007 (the "Registration Statement") under the Securities Act of 1933, as amended (the "Securities Act").

We have reviewed, among other things, (i) the Securities Purchase Agreement, dated March 3, 2008, among the Company and the purchasers party thereto (the "Purchase Agreement"), (ii) the Indenture Agreement, dated March 3, 2008, by and between the Company and U.S. Bank National Association, as Trustee, (iii) the Amended and Restated Articles of Incorporation of the Company, as in effect as of the date hereof (the "Restated Articles"), (iv) the Amended and Restated Bylaws of the Company, as in effect as of the date hereof, (v) the form of note for the Convertible Notes, and (vi) the records of the corporate proceedings and other actions taken or proposed to be taken by the Company in connection with the authorization, issuance and sale of the Convertible Notes. We have made such other factual inquiries as we deemed necessary to render this opinion.

We have assumed that (i) the Registration Statement, and any amendments thereto, will remain effective during the period when the Convertible Notes are offered, sold or issued, including upon the conversion of the Convertible Notes and (ii) the Convertible Notes will be issued in the form we have reviewed and will have been signed by a duly authorized signatory.

Based upon the foregoing and our examination of such questions of law as we have deemed necessary or appropriate for the purpose of our opinion, and subject to the limitations and qualifications expressed herein, it is our opinion that (a) the Convertible Notes, when sold and delivered in accordance with the Purchase Agreement and after receipt of payment therefor, will be validly issued, fully paid and non-assessable, and (c) the shares of Common Stock of the

Heller Ehrman LLP 701 Fifth Avenue, Suite 6100 Seattle, WA 98104-7098 www.hellerehrman.com

| Anchorage | Beijing | | Hong Kong | Los Angles | Madison, WI | New York | San Diego | San Francisco | Seattle |
| Silicon Valley | | Singapore | | Washington, D.C. | | | | | |

Cell Therapeutics, Inc.
March 3, 2008
Page 2

Company, no par value, underlying the Convertible Notes, when issued upon conversion of the Convertible Notes in accordance with the Indenture will be validly issued, fully paid and non-assessable.

This opinion is limited to the federal laws of the United States of America and the laws of the State of Washington, and we disclaim any opinion as to the laws of any other jurisdiction.

We hereby consent to the filing of this opinion as an exhibit to the current report on Form 8-K to be filed with the Commission on the date hereof for incorporation by reference into the Registration Statement and to the reference to this firm under the heading "Legal Matters" in the Prospectus Supplement.

Very truly yours,

/s/ Heller Ehrman LLP

# EXHIBIT E

EX-17.1 2 dex171.htm CORRESPONDENCE ON DEPARTURE OF DIRECTOR FROM SILVANO
SPINELLI

Exhibit 17.1

New York August 19, 2005

To Dr. Max Link, the Chairman of the CTI Board of Directors

With this letter I resign effective immediately from the Board of Directors of CTIC.

My resignation is due to the denial by the Board of Directors of CTI to replace James Bianco with a more credible and reliable CEO in
the interest of shareholders and the company.

I am also giving notice that I resign from any Executive role in the company. I am not seeking nor will I accept any severance
payment, other than what is my right to receive according to the Italian law. This because I intend to retain in full my rights.

I recognise that by resigning I waive my rights to my CTI stock options and to any restricted shares.

I remain available to fulfil the notice period of three months, if required, as defined by the Italian law. This to ensure that a smooth
transition of my duties is accomplished and also that a continuous support of key activities to complete xyotax NDA package is
ensured.

With best personal regards.

/s/ Silvano Spinelli

Silvano Spinelli
Via Gondar 51
20052 Monza, Italy

# EXHIBIT F



**ROCK HILL PARTNERS**

Rock Hill Investment Management, L.P · Three Bala Plaza · East · Suite 585 Bala Cynwyd · PA 19004 · Tel. 610 949 9700  Fax 610 949 9600

March 5, 2008

Mr. James A. Bianco, M.D.
President and Chief Executive Officer
Cell Therapeutics, Inc.
501 Elliott Avenue West, Suite 400
Seattle, WA 98119

Re: Cell Therapeutics, Inc. (the "Company") – Redemption Upon Triggering Events

Dear James:

Reference is made to that certain Securities Purchase Agreement entered into between the Company and RHP Master Fund, Ltd. ("RHP") on February 8, 2007 (the "Purchase Agreement") and to that certain Designation of Preferences, Rights, and Limitations of Series A 3% Convertible Preferred Stock filed by the Company with the Secretary of State of Washington on February 9, 2007 (the "Series A Preferred"). This letter constitutes RHP's election, in accordance with the provisions of Section 9 of the Series A Preferred, to redeem all of its Series A Preferred Stock (as defined in the Series A Preferred) at the Triggering Redemption Amount (as defined in the Series A Preferred).

The Triggering Redemption Amount is determined in accordance with its definition as one hundred thirty percent (130%) of the Stated Value (as defined in the Series A Preferred) plus one hundred percent (100%) of the accrued and unpaid dividends thereon,

Cell Therapeutics, Inc.
March 5, 2008
Page 2

and all liquidated damages and other costs, expenses or amounts due in respect of the
Series A Preferred Stock.

Specifically, yesterday the Company publicly announced that it had induced certain
holders of the Company's Series A 3% Preferred Stock, Series B 3% Convertible Preferred
Stock, Series C 3% Convertible Preferred Stock, and Series D 7% Convertible Preferred
Stock, to convert their preferred shares for an aggregate cash payment by the Company of
approximately $16.2 million. Such cash inducements, constitute a breach by the Company
of Section 4.8 of the Purchase Agreement because such inducement was not made to all
Series A Preferred Stock holders on a basis that afforded equal treatment (including
amount, terms, and timing of such inducement); RHP was not among the Series A
Preferred Stock holders to whom the inducement was made.

Accordingly, RHP hereby demands immediate payment in cash from the Company
of the Triggering Redemption Amount of $326,354.17.

Please note that the amount of accrued and unpaid interest and the amount of
liquidated damages and other amounts owed will continue to increase in accordance with
Section 9 of the Series A Preferred until all amounts owed to RHP are paid in full by the
Company.

Please immediately forward by wire transfer of immediately available funds an
aggregate payment of $326,354.17 to RHP in accordance with the wire transfer
instructions set forth on Schedule 1 to this letter.

Cell Therapeutics, Inc.
March 5, 2008
Page 3

Please be advised that RHP reserves all of its rights and remedies under the

Purchase Agreement, the Series A Preferred, and the other transaction documents entered

into by the Company and RHP in connection therewith.

Sincerely,

RHP Master Fund, Ltd.
By: Rock Hill Investment Management, L.P.
By: RHP General Partner, LLC

By: Keith Marlowe
Its: Director

cc:     Karen Dempsey, Esq., Heller Ehrman, LLP
        Gerald J. Guarcini, Esq., Ballard Spahr Andrews & Ingersoll, LLP

## Schedule I

### Wire Instructions

Goldman Sachs:

Citibank, N.A. New York
ABA # 021000089
Account - Goldman Sachs International
Account Number - 40616408
F/F/C Account #: 083-89322-3
F/F/C Account Name: RHP Master Fund, Ltd.

# EXHIBIT G

# HellerEhrman LLP

March 14, 2008

*Via U. S. Mail*

Daniel J. Dunne, Jr.
daniel.dunne@hellerehrman.com
Direct +1.206.389.6026
Direct Fax +1.206.515.8950
Main +1 (206) 447-0900
Fax +1 (206) 447-0849

26666.0004

Keith Marlowe, Director
Rock Hill Partners, LLC
3 Bala Plaza, East
Suite 585
Bala Cynwyd, PA  19004

**Re:    Cell Therapeutics, Inc.**

Dear Mr. Marlowe;

I represent Cell Therapeutics, Inc. ("CTI"), and have been asked to respond to your letter dated March 5, 2008, written on behalf of RHP Master Fund, Ltd. ("RHP"). In the March 5 letter, RHP demands payment of a Triggering Redemption Amount. For the reasons stated below, CTI has no obligation to pay RHP a Triggering Redemption Amount.

As you are aware, on or about March 4, 2008, CTI completed transactions with certain holders of its convertible preferred stock, including holders of the Company's Series A 3% Convertible Preferred Stock ("Series A CPS"). In these transactions, the Company issued $51,655,000 aggregate principal amount of 9% convertible senior notes and warrants to purchase shares of CTI common stock with an exercise price of $1.41 per share, together with certain warrants. Each Purchaser agreed to convert its shares of preferred stock into common stock in accordance with the respective terms of such series of preferred stock as set forth in the Company's Amended and Restated Articles of Incorporation. The Company paid an inducement payment to certain holders of Preferred Stock who surrendered a duly completed and signed Notice of Conversion on the Closing Date. All such conversions occurred in accordance with the existing terms of such series of Preferred Stock as set forth in the Company's Amended and Restated Articles, including the existing terms of the Series A CPS.

Heller Ehrman LLP  701 Fifth Avenue, Suite 6100  Seattle, WA  98104-7098  www.hellerehrman.com

Beijing  Hong Kong  London  Los Angeles  Madison, WI  New York  San Diego  San Francisco  Seattle/Anchorage  Shanghai  Silicon Valley  Singapore  Washington, D.C.

HellerEhrman.....

Keith Marlowe
March 14, 2008
Page 2

RHP alleges that "[s]uch cash inducements, constitute a breach by the Company of Section 4.8 of the Purchase Agreement because such inducement was not made to all Series A CPS holders on a basis that afforded equal treatment." We lack information sufficient to determine whether RHP was offered an opportunity to participate in these transactions, and reserve our rights to object to your contention if the facts establish that RHP or its affiliates received an offer.

In any event, the transaction involving the issuance of 9% Convertible Senior Notes and warrants did not violate the Securities Purchase Agreement. Section 4.8 provides in relevant part:

> 4.8     Equal Treatment of Purchasers.  No consideration shall be offered or paid to any Person *to amend or consent to a waiver or modification of any provision* of any of the Transaction Documents unless the same consideration is also offered to all of the parties to the Transaction Documents….

CTI did not breach this provision because the inducement was not paid to "amend," obtain "consent to waiver," or "modify" any of the Transaction Documents. Quite to the contrary, the payment was made for the express purpose of inducing holders to "convert" their convertible preferred stock precisely according to the existing terms of such Transaction Documents. For this reason, among others, no Triggering Event has occurred, and no Triggering Redemption amount is due.

CTI may have other objections and defenses to RHP's contention that are not stated herein. There may be additional facts of which CTI is unaware that would affect the parties' relative rights, remedies and defenses. CTI does not in any way waive any such rights or defenses, and expressly reserves all of its rights and remedies with respect to RHP, whether or not those rights and remedies are set forth above.

Very truly yours,

Daniel J. Dunne, Jr.

cc:     James Bianco, M.D.

SE 2245167 v1
3/14/08 1:44 PM (26866.0004)

# EXHIBIT H

LAW OFFICES

**BALLARD SPAHR ANDREWS & INGERSOLL, LLP**
1735 MARKET STREET, 51ST FLOOR
PHILADELPHIA, PENNSYLVANIA 19103-7599
215-665-8500
FAX: 215-864-8999
WWW.BALLARDSPAHR.COM

BALTIMORE, MD
BETHESDA, MD
DENVER, CO
LAS VEGAS, NV
LOS ANGELES, CA
PHOENIX, AZ
SALT LAKE CITY, UT
VOORHEES, NJ
WASHINGTON, DC
WILMINGTON, DE

GERALD J. GUARCINI
DIRECT DIAL: (215) 864-8625
PERSONAL FAX: (215) 864-9181
E-MAIL: GUARCINI@BALLARDSPAHR.COM

March 26, 2008

**Via E-mail and U.S. Mail**

Daniel J. Dunne, Jr.
Heller Ehrman LLP
701 Fifth Avenue
Suite 6100
Seattle, WA 98104-7098

    Re: Cell Therapeutics, Inc.

Dear Mr. Dunne:

    This firm represents RHP Master Fund, Ltd. ("RHP"), a holder of Series A 3% Convertible Preferred Stock ("Series A Preferred") of Cell Therapeutics, Inc. (the "Company"). The shares of Series A Preferred were purchased by RHP and other investors pursuant to that certain Securities Purchase Agreement dated as of February 8, 2007 (the "Purchase Agreement") and are governed by the provisions of that certain Designation of Preferences, Rights, and Limitations of Series A 3% Convertible Preferred Stock filed by the Company with the Secretary of State of the State of Washington on February 7, 2007 (the "Series A Designation"). I am in receipt of a copy of your letter to RHP dated March 14, 2008, which responds to RHP's letter to the Company dated March 5, 2008.

    The assertion in your letter that the disparate treatment of the purchasers of Series A Preferred did not violate Section 4.8 of the Purchase Agreement, which mandates the equal treatment of such purchasers, is simply not correct. First, we confirm that, as stated in RHP's letter of March 5, 2008, "RHP was not among the Series A Preferred Stock holders to whom the inducement was made." Your letter states that you "lack information sufficient to determine whether RHP was offered an opportunity to participate in these transactions." Perhaps you should consult with your client on this point, as they must know who they offered consideration in violation of Section 4.8 of the Purchase Agreement and who they did not.

DMEAST #10007806 v3

Daniel J. Dunne, Jr.
March 26, 2008
Page 2

       Second, your assertion that the so-called "inducement payment" somehow did not violate Section 4.8 of the Purchase Agreement merely because you claim it is not an "amendment or consent to a waiver or modification of any of the provisions of the Transaction Documents," but instead an "inducement," is ridiculous. The so-called "inducement payment" by the Company is nothing more than a reduction in the conversion price for those Series A Preferred holders the Company "induced" or, more precisely, an amendment or modification of the definition of Conversion Price (as defined in Section 6(b) of the Series A Designation). Those Series A Preferred holders that the Company "induced" received, upon conversion of their Series A Preferred, common stock at the Conversion Price plus cash. Nowhere in the Series A Designation is this permitted and it is certainly not permitted only to select Series A Preferred holders of the Company's choosing. Since a change in the Conversion Price can only be accomplished through an amendment to the Series A Designation or a modification of the existing rights therein, not only did such so-called "inducement payment" violate Section 4.8 of the Purchase Agreement, it also violated the Series A Designation and the Company's Amended and Restated Articles of Incorporation ("Articles of Incorporation"), as it acted to amend the Series A Designation without the proper approval of the Series A Holders and the shareholders of the Company.

       Further, modification of the Conversion Price for some Series A Preferred holders and not others clearly violates not only the express language of Section 4.8, but the spirit of such provision, which, as stated therein, "is intended for the Company to treat the Purchasers as a class." Such disparate treatment of shareholders of the same class is also impermissible under the corporation law of most, if not all, states.

       Your letter and arguments appear to be mere stall tactics and would be likely dismissed quickly in any court proceeding. I suggest your client actually abide by the terms of its agreements with RHP and pay my client the amounts owed. Accordingly, as stated in RHP's letter, RHP is entitled to redeem, and has elected to redeem, all of its Series A Preferred at the Triggering Redemption Amount (as defined in the Series A Designation). As of the date hereof, such amount is $328,475.47, which amount will continue to increase in accordance with the terms of Series A Preferred until all amounts owed to RHP are paid in full by the Company. This payment should be made by wire transfer in accordance with the wire transfer instructions attached as Schedule I hereto no later than the close of business on Thursday, March 27, 2008.

       We reserve on behalf of RHP all of its rights and remedies under the Securities Purchase Agreement, the Series A Designation, and the other transaction documents entered into by RHP and the Company.

       Any further correspondence should be directed to me as counsel to RHP.

                  Sincerely,

                  Gerald J. Guarcini

GJG/elp
cc:    Keith Marlowe

DMEAST #10007806 v3

## Schedule I

## Wire Instructions

Goldman Sachs:

Citibank, N.A. New York
ABA # 021000089
Account – Goldman Sachs International
Account Number – 40616408
F/F/C Account #: 033-89322-3
F/F/C Account Name: RHP Master Fund, Ltd.

# EXHIBIT I

# HellerEhrman LLP

**Facsimile Transmittal**

701 Fifth Avenue, Suite 6100
Seattle, WA 98104-7098
Main +1 (206) 447-0900
Fax +1 (206) 447-0849

| | |
|---|---|
| **To:** | Gerald J. Guarcini, Ballard Spahr Andrews & Ingersoll, LLP |
| **Telephone:** | (215) 665-8500    **Fax:**    (215) 864-8999 |

| | |
|---|---|
| **From:** | Daniel J. Dunne, Jr. |
| **Telephone:** | +1.206.389.6026 |
| **Direct Fax:** | +1.206.515.8950 |

| | |
|---|---|
| **No. of Pages:** | 3 (including cover) |
| **Date:** | April 10, 2008 |

26866.0021 (315)

**Message:    Re: Cell Therapeutics, Inc. and RHP Master Fund Ltd.**

**Faxing Letter to Gerald J. Guarcini from Daniel Dunne dated April 10, 2008**

**Hard copy will follow via U.S. Mail.**

SE:2248117 v1
4/10/08 8:50 AM (26866.0021)

The information contained in this communication is intended only for the use of the addressee and may be confidential, may be attorney-client privileged and may constitute inside information. Unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error or you have not received all pages, please call the sender immediately at +1 (206) 447-0900.

Heller Ehrman LLP    www.hellerehrman.com

Beijing   Hong Kong   London   Los Angeles   Madison, WI   New York   San Diego   San Francisco   Seattle/Anchorage   Shanghai   Silicon Valley   Singapore   Washington, D.C.

04/10/2008 12:18 FAX                                              ⓐ002/003

# HellerEhrman LLP

April 10, 2008

*Via U. S. Mail and Facsimile*

Daniel J. Dunne, Jr.
daniel.dunne@hellerehrman.com
Direct +1.206.389.6026
Direct Fax +1.206.515.8950
Main +1 (206) 447-0900
Fax +1 (206) 447-0849

26866.0021

Gerald J. Guarcini
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103-7599

Re:  **Cell Therapeutics, Inc. and RHP Master Fund Ltd.**

Dear Mr. Guarcini:

Thank you for your letter of March 26, 2008 on behalf of RHP Master Fund, Ltd. We have carefully considered your arguments, but your letter does not alter our previously stated position with respect to the proper construction of Section 4.8 of the Securities Purchase Agreement dated February 8, 2007. While we appreciate your arguments to the contrary, we believe that the language of the agreement is quite clear and unambiguous, and are confident that CTI has acted in compliance with its obligations.

You have advised me that RHP is considering filing a legal action in New York. In our telephone discussion of April 7, we discussed some of the other considerations at play. As you know, recently, CTI substantially reduced its work force and restricted or eliminated some important operations to conserve cash. I pointed out that the "liquidated damages" portion of RHP's claim is approximately $75,000, and that it would take at least a year of expensive litigation to obtain a judgment. Expensive litigation over such a small sum is in neither of our client's interests. In light of its serious cash flow problems, CTI continues to evaluate its options to restructure its capital structure. My suggestion is that RHP not file a lawsuit, but wait to see if an attractive new conversion proposal is made available to RHP and other remaining preferred shareholders over the next several months. RHP will retain its claims and will still be able to pursue litigation if no opportunities are presented within a reasonable time frame this year. In the meantime, both of our clients will avoid litigation distractions and expense, to their mutual benefit.

Please consider that the investors who converted their preferred stock according to the terms of their respective agreements contributed $51.7 million to the company to acquire Convertible Senior Notes, of which $16.2 million was repaid to them in connection with the

Heller Ehrman LLP  701 Fifth Avenue, Suite 6100  Seattle, WA  98104-7098  www.hellerehrman.com

Beijing  Hong Kong  London  Los Angeles  Madison, WI  New York  San Diego  San Francisco  Seattle/Anchorage  Shanghai  Silicon Valley  Singapore  Washington, D.C.

☑ 003/003

HellerEhrman<sub>LLP</sub>

Gerald J. Guaremi
April 10, 2008
Page 2

CPS conversions. The new money contributed by these investors has allowed the company to continue to fund operations for the benefit of all securities holders, including RHP.

Again, we understand your client's position, but we respectfully disagree with your contention that a Triggering Event has occurred. In any event, I hope you will keep an open mind to the suggestion made above.

Best regards,

Very truly yours,

Daniel J. Dunne, Jr.